Filed 11/17/14  Goodman v. Raytheon Co. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| RONALD GOODMAN, | B252818 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC453493) |
| v. | |
| RAYTHEON COMPANY et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Judge Richard E. Rico.  Affirmed.

Shegerian & Associates, Carney R. Shegerian, James Urbanic, and Anthony Nguyen, for Plaintiff and Appellant.

Brown Gitt Law Group, Thomas P. Brown and Lawrence L. Yang, for Defendants and Respondents, Raytheon Company and James A. Alpough.

_____

Ronald Goodman retired in July 2010 at age 59 after working for Hughes Aircraft and its successor, Raytheon Company, for 39 years. Contending he had been coerced into leaving the company, Goodman sued Raytheon and his supervisor James A. Alpough for age discrimination, harassment, wrongful termination and breach of contract, alleging age-related bias was a substantial factor in creating intolerable working conditions that constituted a constructive termination. The trial court granted summary judgment in favor of Raytheon and Alpough.[1] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Goodman's Employment at Raytheon*

Goodman began working at Hughes in 1972 as a stock clerk. After Hughes and Raytheon merged in 1997, Goodman retained the same job title, responsibilities, compensation and seniority as he had with Hughes. Goodman was promoted 11 times during the course of his career with the companies.

#### a. *The 2006 performance review*

In June 2006 Goodman, by then a supply chain manager, was assigned to the space and airborne systems business unit and reported to Janet Duffey. Goodman's performance evaluation for 2006 rated him as "meets requirements." According to Goodman's declaration submitted in support of his opposition to Raytheon's motion for summary judgment, at the end of a meeting with Duffey to discuss the evaluation, she said, "I'm supposed to ask you about retirement." According to Goodman, after he said he did not plan to retire until he was 66 years old, Duffey "appeared disappointed, shook her head and ended the meeting." Goodman also asserted he was occasionally referred to as a "super senior" around this time and was subsequently told by two managers and one director the company was no longer interested in him, preferring "someone (1) younger, (2) cheaper, and (3) who could grow with the company."

---

[1]     Because there is no reason to distinguish between Alpough and Raytheon for purposes of the appeal, we will generally refer only to Raytheon as the defendant.

b. *The 2007 performance review*

Goodman's performance evaluation for 2007 rated him "needs improvement." Goodman filed an internal complaint seeking to have the rating changed to meets requirements on the grounds he had not been informed during 2007 his performance was deficient; he believed negative comments made by John Wong, to whom he had reported for four months while working on the Millennium program, were retaliatory because Goodman had twice complained to Wong about unethical conduct including Wong's purported alteration of a proposal Goodman had drafted; and input had not been solicited from other key people Goodman had supported in 2007.

After an extensive investigation Raytheon found unsubstantiated Goodman's assertions Wong's negative evaluation was retaliatory and Goodman had not been told his performance was deficient. Bryce Wynn, an employee in human resources, reported he had been told Goodman "needs to be spoon-fed" and, when he met with Goodman to discuss his review, Goodman agreed he "wasn't a good fit" with the Millennium program from the beginning. Molly Kaplan, also with human resources, reported two Millennium program managers whose input had not been sought in connection with Goodman's 2007 review agreed with the needs improvement rating. They told Kaplan Goodman's work needed to be checked or redone; his estimates "were not even close"; Goodman was "non value-added"; and Goodman did not "handle tasks very well." Nevertheless, the company changed Goodman's rating to meets requirements because the 2007 review had erroneously reflected only Goodman's work on the Millennium program and some people Goodman had supported on other programs reported his performance met or exceeded expectations. For example, K2 program manager Karen Nourrcier indicated Goodman, who began working on the K2 program in late 2007, exceeded expectations in several areas. She noted, however, the "level of pressure and visible [*sic*] was low on K2" and it "was a more conventional program, don't need to work your life around the program."

3

c. *The 2008 performance review*

During 2008 Goodman primarily worked on the K2 program but also provided support for proposals including Iridium and Tangent. His 2008 performance review rated him meets requirements with key strengths identified as his knowledge of certain processes and responsiveness to, and excellent relationship with, the project management office. Key development needs included better communication and being more proactive; the evaluation noted Goodman "'does not make an issue out of things until it is almost too late'" and "'is not necessarily proactive in taking action to head off issues.'"

Goodman's leadership on the K2 program team was acknowledged (and eight individuals were recognized for their outstanding contributions) in a December 22, 2008 email from Nourrcier: "The team was led by two senior and very knowledgeable individuals: Ron Townsend, Manufacturing Operations and Ron Goodman for Supply Chain." Additionally, in June 2009 Goodman received an achievement award bonus of $500 at Nourrcier's request "in recognition of [his] special contributions toward meeting Company goals."

d. *The 2009 performance review and Goodman's retirement*

In July 2009 Alpough was appointed director of the space systems' supply chain. According to Goodman's declaration, Alpough soon thereafter announced in a staff meeting that the group was "broken," he was going to "fix it" and "take it in a new direction," and it would no longer be "business as usual." Alpough also began criticizing Goodman. Goodman contended Alpough twice complained Goodman was "stuck in the past"; on several occasions he accused Goodman of being physically and mentally slow; and once he told him, "[Y]ou need to pick up the pace. I need someone with more energy handling this job." Additionally, Alpough repeatedly belittled Goodman during staff meetings. Once he yelled at Goodman in front of his peers; told Goodman he was tired of being disappointed by him; advised him he needed to learn how to use a computer and taunted him to take a "remedial" spreadsheet class; and, when Goodman tried to leave after the 15-minute tirade, followed him into the hallway yelling that Goodman had

4

embarrassed him. In contrast, Nourrcier, with whom Goodman had worked daily, never criticized Goodman for deficient performance.[2]

In February 2010 Goodman received his 2009 performance review from supply chain senior manager Lissa Blomer, who reported directly to Alpough. Goodman was rated "improvement required," and the evaluation reported his performance on the K2 program had steadily declined although Goodman had "met many of his goals." Key development areas identified included, "Increased sense of urgency that drives to meeting deadlines and effective results"; "[p]rovide data that is accurate, appropriate, well thought out and meets or exceeds the expected requirement"; and "[p]roactively take the lead rather than waiting for others to initiate action." In late February 2010 Goodman wrote a response to the review, contending issues with a K2 proposal "were predominately caused by a '[b]roken' proposal process," and Blomer herself led a proposal that "wound up late and in frenzy," demonstrating "a lack of '[p]roactive' behavior associated with her proposal."

On April 12, 2010 Goodman gave Raytheon notice he intended to retire on June 1, 2010. Goodman explained in his declaration it was clear to him he was being forced out by management due to his age and he could no longer tolerate the stress and anxiety of working with Alpough, who continued to shun and publicly humiliate him. Nevertheless, Goodman rescinded his notice three days later after consulting with a financial adviser. On April 20, 2010 Goodman filed an internal complaint contending his 2009 review was "very subjective" and would have a negative effect on his retirement.

In May 2010 Goodman was placed on a performance improvement plan requiring review of his work every two weeks and stating he was expected to obtain results on time

---

2    Nourrcier testified Goodman did an excellent job the first year he worked on the K2 program, but then his performance deteriorated as the program "ramped up and there were more needs from a supply chain side." Goodman became reactive to problems and made "repetitive mistakes." Nourrcier spoke to Goodman about these concerns and commented he was not sufficiently proactive in one of his performance reviews. Nourrcier also testified she "always [saw] supply chain as broken," calling it an "organizational problem," which she complained about "to everyone."

and within budget on enumerated tasks.[3] On June 16, 2010 Goodman was asked to submit a chart weekly identifying every daily task he had performed and the amount of time taken to complete each task. Goodman advised human resources he viewed the request as "a form [of] hostility and harassment."

In a June 24, 2010 letter Alpough informed Goodman that Raytheon had found his 2009 needs improvement rating "was based on objective criteria and fair and legitimate critiques of [his] performance." Alpough explained, "While it is acknowledged that you met many of your goals, there were significant targets that you failed to reach and ongoing negative performance trends that require improvement for success at your salary grade level. . . . [¶] . . . At the Salary Grade 6 level, you are expected to proactively manage your projects, anticipating needs and challenges, and implementing action plans for risk avoidance and timely goal achievement. . . . A consistent comment from others who interface with you is that you procrastinate in accomplishing tasks. While there is evidence you respond to issues and often resolve situations—a more robust management of the situation from the beginning could avoid last-minute crises. A similar theme is that you frequently have to check with others for the answers to questions, rather than having already thought through issues and done the research. You require more direction and guidance than is expected at your level. [¶] The findings also show that you do not hold yourself accountable for accurate work product. You do not appear to appreciate the gravity of errors impairing your ability to be effective and for causing excessive work/rework by others." Coworker evaluation forms of Goodman completed in winter 2009 were mixed, giving him a "qualitative rating" between 2 and 9. In interviews with additional personnel conducted in connection with Goodman's complaint, 80 percent of interviewees believed Goodman underperformed and 20 percent rated him at the meets requirements level.

---

[3] Alpough testified at his deposition every employee who received a needs improvement rating was placed on a performance improvement plan.

6

Although Goodman had planned to work five or six more years to make his retirement more financially secure, he "agreed to retire" on July 1, 2010 because "conditions were so intolerable." Goodman had been experiencing severe neck and back pain, which his doctor told him was a sign of stress, as well as anxiety and depression.

2. *The Complaint*

In January 2011, after submitting an administrative complaint to the Department of Fair Employment and Housing, Goodman filed a complaint asserting causes of action for age discrimination in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940, subd. (a)),[4] harassment on the basis of age (§ 12940, subd. (j)(1) & (3)),[5] retaliation for complaining of discrimination and harassment (§ 12940, subd. (h)), wrongful termination in violation of public policy, and breach of express and implied-in-fact contracts not to terminate his employment without good cause.[6] The complaint alleged Raytheon had constructively terminated Goodman by harassing and discriminating against him because of his age until he felt he had no choice but to retire. The complaint further alleged Goodman's reports to human resources about this age discrimination and harassment were factors in his constructive termination.

3. *The Trial Court's Order Granting Summary Judgment*

a. *Raytheon's motion*

In January 2012 Raytheon moved for summary judgment or in the alternative summary adjudication on grounds including Goodman had not been satisfactorily performing his job and, having voluntarily retired, was not subjected to an adverse employment action; his replacement was nearly his same age; and any age-related comments were "stray remark[s]" that were not so severe or pervasive as to create an abusive working environment or intolerable working conditions. Raytheon argued

---

4     Statutory references are to the Government Code unless otherwise indicated.

5     This is the only cause of action asserted against Alpough.

6     Goodman's wife, Christine M. Bell-Goodman, joined in the complaint asserting a cause of action for loss of consortium. That claim was subsequently dismissed.

7

Goodman's theory his age was the true cause for his negative performance reviews was contradicted by his deposition testimony in which, for example, he acknowledged he had made arithmetic errors in 2009 that had been called to his attention: Goodman was asked, "[D]o you in any way take ownership for any of the shortcomings with respect to the Iridium process?" He answered, "Yeah, because it came down to the wire, and, I don't know, I was making stupid math errors and things like that, and—but it's ironic that as soon as Lissa [Blomer] would leave my office I would find my mistake and correct it." When asked whether Blomer had been in Goodman's office on some occasions to point out these errors, Goodman said, "She was practically living there, yeah."

Raytheon further argued Goodman's deposition testimony undermined his contention Alpough had singled him out and was harassing him because of his age, not deficiencies in his performance. Goodman testified Alpough repeatedly humiliated him during meetings, telling him in a malicious tone of voice he had embarrassed Alpough, but acknowledged one of the most severe instances was after Goodman had "screwed up" a template even though the numbers were accurate. Additionally, Goodman testified "[i]t wasn't rare" for Alpough to make negative comments to other employees during these meetings. Regarding Alpough's accusation Goodman was "slow," Goodman testified he believed Alpough was referring to his demeanor, not the timeliness of his work, explaining, "I would come across as maybe lacking a sense of urgency, but in fact, you know, it's there all the time. I just may not display it."

b. *Goodman's opposition*

Largely supported by his postdeposition declaration, Goodman argued nine categories of direct evidence of discriminatory intent combined with some positive statements in his performance reviews and coworker evaluations, established triable issues of material fact as to whether he had been harassed and then constructively discharged because of his age: (1) age-related comments by management indicating a preference for younger employees, including managers using the term "young blood" at least 50 times "to describe efforts to refresh or invigorate their departments"; (2) management's suggestion Goodman retire, that is Duffey appearing surprised and

8

shaking her head in 2007 when Goodman indicated he did not intend to retire until he was 66 years old; (3) human resources' failure to follow up on Goodman's complaints he was being treated differently because of his age and had been called a "super senior"; (4) Alpough's assertion he would be taking the supply chain in a new direction in conjunction with direct and indirect comments by Alpough about Goodman's age, including telling Goodman he was "stuck in the past" and "slow" and someone with "more energy" was needed to handle the job; (5) Blomer telling Goodman he needed to change the way he worked, calling him a "dinosaur," and telling him dinosaurs are extinct; (6) Alpough effectively firing Goodman twice when he told him he had no work for him, even though Goodman was busy on the K2 program, and would not help him find work elsewhere in the company (Goodman later learned an individual in his early 30's got the job even though he did not have the necessary security clearances, which Goodman had); (7) management's statements they wanted younger employees, specifically Alpough's comment in March 2010 that none of the directors Alpough had spoken to about work for Goodman wanted anything to do with him because they wanted somebody younger on a career path; (8) placing Goodman on a performance improvement plan, which effectively made him ineligible for annual salary increases and profit sharing; and (9) requiring Goodman to keep track of every task he performed, which was demeaning and had never been required of any other employee.

Goodman also submitted a declaration from Craig Snyder, a psychologist who had performed a forensic psychological evaluation of Goodman. Dr. Snyder opined Goodman was not "in any measurable way, embellishing or malingering his clinical symptoms" and his "psychological health would have seriously deteriorated" if he had continued to work "under the distressing and hostile conditions that he reported." Snyder further opined, "if the 'average employee' were subjected to these same conditions they would, with great certainty, likely develop an impairing psychiatric condition."

c. *Raytheon's reply*

Raytheon argued most of the age-related comments described in Goodman's declaration were contradicted by his deposition testimony and thus failed to create a

9

triable issue of material fact. Raytheon further contended, even if the statements in Goodman's declaration were not disregarded, none raised a triable issue of fact whether Goodman had suffered age-based discrimination or harassment. For example, many comments were made years before Goodman decided to retire and, in any event, failed to undermine the evidence (and Goodman's admissions) that his performance had been declining.

### d. *Goodman's surreply*

In a surreply Goodman accused Raytheon of mischaracterizing the law and the evidence, contended he had not conceded he had performed poorly and reiterated many of his previous arguments. Additionally, citing to testimony from his deposition taken after his opposition had been filed,[7] Goodman argued further evidence of the discrimination he faced was (1) being told by senior managers, when he applied for a position in radar technology, that they were surprised he was given an interview because they "thought they were getting somebody younger"; and (2) other long-term employees who were close to retirement had discovered their jobs were posted online as open positions.

### e. *The trial court's ruling*

The trial court granted summary judgment in favor of Raytheon, finding the evidence insufficient to establish a triable issue of material fact that Goodman had been constructively discharged, and, even if it did, the evidence was insufficient to demonstrate a triable issue of material fact that age discrimination was a substantial factor in his constructive termination or that Raytheon would not have had a legitimate business reason to terminate Goodman if he had not voluntarily retired. As for Goodman's age-based harassment claim, the court found any "less than courteous"

---

7       When Goodman filed his opposition in March 2012, he also sought a continuance of the April 3, 2012 summary judgment hearing date to obtain discovery on a new theory to oppose Raytheon's motion. The continuance was granted. Although the new theory was apparently abandoned, Goodman's surreply relies on testimony from his deposition taken in January 2013.

treatment of Goodman by Alpough "was due to dissatisfaction with [Goodman's] work" and was not based on Goodman's membership in the protected class. The court found Goodman's retaliation claim without merit because Goodman had failed to address the claim in his opposition papers or to clarify what complaints he had made to human resources and had testified at his deposition he did not recall telling anyone in human resources his age was being used against him. The court further found no triable issues of material fact with respect to Goodman's claims for wrongful termination in violation of public policy because there was no evidence Goodman had been constructively discharged or that, if he had, it was due to any protected activity. Finally his claims for breach of express and implied-in-fact contracts not to terminate without good cause failed because he was an at-will employee.

## DISCUSSION

### 1. *Standard of Review*

A motion for summary judgment is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) We review a grant of summary judgment de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (*Schachter v. Citigroup, Inc*. (2009) 47 Cal.4th 610, 618; *Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) The evidence must be viewed in the light most favorable to the nonmoving party. (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 703; *Schachter,* at p. 618.)

When a defendant moves for summary judgment in a situation in which the plaintiff would have the burden of proof at trial by a preponderance of the evidence, the defendant may, but need not, present evidence that conclusively negates an element of the plaintiff's cause of action. Alternatively, the defendant may present evidence to "'show[] that one or more elements of the cause of action . . . cannot be established' by the plaintiff." (*Aguilar v. Atlantic Richfield, Co.* (2001) 25 Cal.4th 826, 853; see Code Civ. Proc., 437c, subd. (p)(2).) "'"The moving party bears the burden of showing the

11

court that the plaintiff "has not established, and cannot reasonably expect to establish,'" the elements of his or her cause of action.""" (*Ennabe v. Manosa*, *supra*, 58 Cal.4th at p. 705; accord, *Wilson v. 21st Century Ins. Co*. (2007) 42 Cal.4th 713, 720 [same]; *Kahn v. East Side Union High School Dist*. (2003) 31 Cal.4th 990, 1002-1003 ["the defendant must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed evidence'"].) Once the defendant's initial burden has been met, the burden shifts to the plaintiff to demonstrate, by reference to specific facts, not just allegations in the pleadings, there is a triable issue of material fact as to the cause of action. (Code of Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850.)

A defendant may also move for summary judgment on the ground there is an affirmative defense to the action. (Code Civ. Proc., § 437c, subds. (o)(2), (p)(2).) Once the defendant meets the burden of establishing all the elements of the affirmative defense, the burden shifts to the plaintiff to show there is one or more triable issues of material fact regarding the defense. (*Jessen v. Mentor Corp*. (2008) 158 Cal.App.4th 1480, 1484-1485 [when a defendant moves for summary judgment, "the burden shifts to the plaintiff to show there is one or more triable issues of material fact regarding the defense after the defendant meets the burden of establishing all the elements of the affirmative defense"]; *Mirzada v. Department of Transportation* (2003) 111 Cal.App.4th 802, 806-807 [once defendant establishes the existence of an affirmative defense, burden on summary judgment shifts to the plaintiff to produce evidence establishing a triable issue of material fact refuting the defense]; see *Huynh v. Ingersoll-Rand* (1993) 16 Cal.App.4th 825, 830.)

2. *The Age Discrimination Claim*

a. *Governing law*

FEHA prohibits an employer from, among other things, discriminating against a person on the basis of age in compensation, terms, conditions or privileges of employment. (§ 12940, subd. (a); see § 12941 [Legislature "reaffirms and declares its

12

intent that the courts interpret the state's statutes prohibiting age discrimination in employment broadly and vigorously, in a manner comparable to prohibitions against sex and race discrimination"].)  "The prohibition is often restated in judicial opinions as a requirement that the discriminatory action result in 'adverse employment action.'" (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 374.)

Discriminatory intent is a necessary element of a discrimination claim.  (See § 12940, subd. (a); *Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1370 [plaintiff's claim based on a disparate treatment theory "requires a showing that the employer acted with discriminatory intent"]; see also *Clark v. Claremont University Center* (1992) 6 Cal.App.4th 639, 662; *Mixon v. Fair Employment & Housing Com.* (1987) 192 Cal.App.3d 1306, 1316.)  In addition, "there must be a causal link between the employer's consideration of a protected characteristic and the action taken by the employer."  (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 215.)  Moreover, to "more effectively ensure[] that liability will not be imposed based on evidence of mere thoughts or passing statements unrelated to the disputed employment decision," a plaintiff must demonstrate "discrimination was a *substantial* motivating factor, rather than simply *a* motivating factor."  (*Id.* at p. 232; see *DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 551 (*DeJung*) ["proof of discriminatory animus does not end the analysis of a discrimination claim.  There must also be evidence of a causal relationship between the animus and the adverse employment action"].)

A plaintiff may prove his or her discrimination case by direct or circumstantial evidence, or both.  (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67.)  "Direct evidence is evidence which proves a fact without inference or presumption."  (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1146-1149; see *DeJung, supra*, 169 Cal.App.4th at p. 550; see generally Evid. Code, § 410 ["'direct evidence' means evidence that directly proves a fact, without an inference or presumption, and which in itself, if true, conclusively establishes that fact"].)  Direct

evidence of discrimination generally takes the form of an admission by a supervisor or other decisionmaker that an adverse employment action (hiring, firing, suspension or the like) was based on a protected characteristic (*Trop*, at p. 1147)—statements to the effect, "You are too old to do the job." (See *DeJung*, p. 550 ["'Ted's a great guy, but we're looking for someone younger'"].)

Because direct evidence of intentional discrimination is rare and most discrimination claims must usually be proved circumstantially, in FEHA employment cases California has adopted the three-stage burden-shifting test established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668]. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 356-357 (*Guz* ); see *Harris v. City of Santa Monica*, *supra*, 56 Cal.4th at p. 214.) "[A] plaintiff has the initial burden to make a prima facie case of discrimination by showing that it is more likely than not that the employer has taken an adverse employment action based on a prohibited criterion. A prima facie case establishes a presumption of discrimination. The employer may rebut the presumption by producing evidence that its action was taken for a legitimate, nondiscriminatory reason. If the employer discharges this burden, the presumption of discrimination disappears. The plaintiff must then show that the employer's proffered nondiscriminatory reason was actually a pretext for discrimination, and the plaintiff may offer any other evidence of discriminatory motive. The ultimate burden of persuasion on the issue of discrimination remains with the plaintiff." (*Harris*, at p. 215; *Guz*, at pp. 354-356.) "The specific elements of a prima facie case may vary depending on the particular facts. [Citations.] Generally, the plaintiff must provide evidence that (1) he [or she] was a member of a protected class, (2) he [or she] was qualified for the position he [or she] sought or was performing competently in the position he [or she] held, (3) he [or she] suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some circumstance suggests discriminatory motive." (*Guz*, at p. 355.)

An employer moving for summary judgment on a FEHA cause of action may satisfy its initial burden of proving a cause of action has no merit by showing either that

one or more elements of the prima facie case "is lacking, or that the adverse employment action was based on legitimate nondiscriminatory factors." (*Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1038; see *Guz, supra,* 24 Cal.4th at pp. 356-357; *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 150.) Once the employer sets forth a nondiscriminatory reason for the decision, the burden shifts to the plaintiff to produce "'substantial responsive evidence' that the employer's showing was untrue or pretextual." (*Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1735; accord, *Slatkin v. University of Redlands* (2001) 88 Cal.App.4th 1147, 1156; see also *Guz,* at p. 357.) "[A]n employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz,* at p. 361; see also *Kelly v. Stamps.com Inc*. (2005) 135 Cal.App.4th 1088, 1097-1098 [if a defendant employer's motion for summary judgment "relies in whole or in part on a showing of nondiscriminatory reasons for the [adverse employment action], the employer satisfies its burden as moving party if it presents evidence of such nondiscriminatory reasons that would permit a trier of fact to find, more likely than not, that they were the basis for the [adverse action]. [Citations.] To defeat the motion, the employee then must adduce or point to evidence raising a triable issue, that would permit a trier of fact to find by a preponderance that intentional discrimination occurred"].)

b. *Constructive discharge as an adverse employment action*

"Constructive discharge" occurs "when the employer coerces the employee's resignation, either by creating working conditions that are intolerable under an objective standard, or by failing to remedy objectively intolerable working conditions that actually are known to the employer." (*Mullins v. Rockwell Internat. Corp*. (1997) 15 Cal.4th 731, 737.) The conditions prompting resignation must be "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1246; see *id*. at p. 1247 ["[i]n order to amount to constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the

15

situation will be deemed intolerable"].) "[A] poor performance rating or a demotion, even when accompanied by reduction in pay, does not by itself trigger a constructive discharge." (*Ibid.*) The resignation must be coerced, not merely a rational option chosen by the employee. (*Vasquez v. Franklin Management Real Estate Fund, Inc.* (2013) 222 Cal.App.4th 819, 827 ["An employee may not simply "'quit and sue,'" claiming to have been constructively discharged. [Citations.] The facts must support a finding that the resignation was 'coerced,' rather than 'simply one rational option for the employee.'"]; *Holmes v. Petrovich Development Co. LLC* (2011) 191 Cal.App.4th 1047, 1062.) Even if coerced, however, standing alone "constructive discharge is neither a tort nor a breach of contract, but a doctrine that transforms what is ostensibly a resignation into a firing. Even after establishing *constructive* discharge, an employee must independently prove a breach of contract or tort in connection with employment termination in order to obtain damages for *wrongful discharge*." (*Turner*, at p. 1251.)

Ordinarily, the focus in a FEHA cause of action is whether discriminatory animus motivated an employer's termination, failure to promote or demotion of an employee, or the taking of another specific adverse employment action that materially affects the terms, conditions or privileges of employment. However, when, as here, constructive discharge is the alleged adverse employment action (see *Steele v. Youthful Offender Parole Bd.* (2008) 162 Cal.App.4th 1241, 1253 [constructive discharge, like actual discharge, is adverse employment action]), no single act or decision is at issue; and the evidence of the employer's motive or intent—be it direct or circumstantial—must necessarily be evaluated with respect to its causal relationship to each of the various working conditions that purportedly combined to create an objectively intolerable working situation. (See *Trop v. Sony Pictures Entertainment, Inc.*, *supra*, 129 Cal.App.4th at pp. 1147-1149 [allegedly discriminating comments were neither temporally nor causally related to plaintiff's discharge].)

Here, much of Goodman's proffered evidence of age-based animus relates to conduct or comments made several years before Alpough became director of the supply chain group in July 2009. Moreover, it is clear from Goodman's declaration the

16

purportedly intolerable actions or conditions he claimed forced his decision to retire—the only adverse employment action alleged—began under Alpough's tenure. For example, Goodman asserted in his declaration he did not begin experiencing anxiety and depression because of conditions at work until approximately July 2009, one year before he retired. To be sure, Goodman contended he had suffered from stress-related neck and back pain during the last two years of his employment. Nevertheless, earlier in the same declaration Goodman asserted he was "held out as a model employee and assigned to mentor two of the younger material managers" between 2008 and 2009 and received an achievement award in June 2009 from Nourrcier recognizing his special contributions toward meeting company goals. Thus, whatever pain he may have experienced and whatever adverse comments may have been made regarding his performance earlier in his employment, for purposes of his claims predicated on constructive discharge as Raytheon's adverse employment action, the trial court properly focused on the period beginning July 2009.

     c. *Raytheon satisfied its initial burden on summary judgment with evidence its treatment of Goodman was justified by serious performance issues, a legitimate, nondiscriminatory reason for its actions*

Whether viewed as being directed to an element of Goodman's prima facie case of discrimination or as an affirmative defense, Raytheon presented abundant evidence the quality of Goodman's work had been deteriorating and his 2009 performance review and placement on a performance improvement plan (and Alpough's concomitant dissatisfaction, albeit perhaps not his mode of expression) were justified: As early as 2007 Raytheon had identified problems with Goodman's work. Although Goodman's 2007 needs improvement rating was ultimately changed to meets expectations because it did not reflect input from all the managers he had supported that year, Raytheon validated during its investigation that the quality of Goodman's performance on the Millennium program, upon which the rating had been based, did not meet expectations. For example, two managers on the program reported Goodman's work needed to be rechecked, his estimates "were not even close" and he was "non value-added." Although Nourrcier had

17

indicated Goodman exceeded expectations when he began working on the K2 program toward the end of 2007, she also noted the program had a low "level of pressure." Additionally, although Goodman received a meets expectations rating in 2007, Nourrcier noted in Goodman's review that he was not proactive, a significant problem in 2009 when the K2 program "ramped up." In connection with his 2009 performance, Goodman conceded in his deposition he had made stupid errors of arithmetic and Blomer was frequently in his office because of his mistakes.

Thus, even if we assume Goodman could establish he had been constructively discharged—an adverse employment action—Raytheon satisfied its initial burden on summary judgment. The burden then shifted to Goodman to produce substantial responsive evidence (direct or circumstantial) from which a reasonable trier of fact could conclude that Raytheon's showing Goodman's performance had deteriorated was pretextual and that his treatment was the product of discriminatory, age-related animus. (*Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 755; *Martin v. Lockheed Missiles & Space co., supra,* 29 Cal.App.4th at p. 1735.) Goodman failed to meet this burden.

> d. *Goodman failed to produce specific, substantial responsive evidence Alpough's treatment of him and the criticism of his performance were motivated by discriminatory animus*

Generally in cases involving affirmative adverse employment actions, pretext may be demonstrated by showing "'the proffered reason had no basis in fact, the proffered reason did not actually motivate the discharge, or, the proffered reason was insufficient to motivate discharge.'" (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 224; see also *Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 [pretext may be shown by "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons"'"].) However, simply showing the employer is lying, without some evidence of

18

discriminatory motive, is not enough to infer discriminatory animus. "'The pertinent [FEHA] statutes do not prohibit lying, they prohibit discrimination.'" (*Guz, supra,* 24 Cal.4th at p. 361; see also *Slatkin v. University of Redlands, supra,* 88 Cal.App.4th at p. 1156.) The record here contains no direct evidence and little, if any, circumstantial evidence that would support a finding of discrimination.

i. *Goodman presented no direct evidence his "intolerable working conditions" were the product of discrimination*

Relying on language in federal employment discrimination cases, Goodman argues direct evidence of discrimination necessarily defeats an employer's motion for summary judgment. However, none of the evidence Goodman proffered in his opposition to the summary judgment motion, even those portions of his declaration that were inconsistent with his deposition testimony, constitutes direct evidence the purportedly intolerable conditions of his employment were the product of, and causally related to, discriminatory animus. And, as discussed in the following section of this opinion, even when combined with the other evidence he advanced, Goodman's showing was insufficient to permit a trier of fact to find by a preponderance of the evidence that intentional discrimination occurred in this case. (See *Guz, supra*, 24 Cal.4th at p. 361.)

Goodman's first category of evidence was comprised of "ageist comments indicating a preference for younger employees," including hearing "management use the expression 'young blood' to describe efforts to refresh or invigorate their departments," with specific examples from 2006, and references to Goodman in 2007 as a "senior guy" or "super senior." To the extent any of those comment occurred after July 2009, they are not direct evidence that the remedial steps Raytheon took were the product of discriminatory intent. Use of senior or super senior, standing alone, is not a negative, age-related comment. Senior as likely describes a person with seniority, like Goodman, as it does an elderly person. Indeed, Goodman referred to himself as a "senior guy" at least three times in his deposition and stated in his declaration his "seniority and years of service remained the same prior and after the" merger between Hughes and Raytheon. Untethered to a specific employment decision or decisionmaker, the "young blood"

19

comments at best were "stray remarks" that "do not constitute 'direct evidence' of discriminatory animus." (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 539.)

Goodman also identified as direct evidence of intentional discrimination Duffey's inquiry in early 2007 whether Goodman intended to retire. According to Goodman Duffey "appeared surprised, shook her head, and ended the meeting." That event occurred more than two years before Alpough joined the supply chain group and had no causal relationship to the conditions of employment Goodman has identified as forcing him to retire. In addition, Goodman's subjective interpretation of Duffey's body language and facial expression is simply not direct evidence of age discrimination. Similarly, human resources' purported failure to investigate his complaints Raytheon was trying to force him to retire on the basis of age, although arguably circumstantial evidence in support of Goodman's claim, is not direct evidence of discrimination.

Alpough's announcement he was going to take the supply chain group in a "new direction" and it would no longer be "business as usual," if anything, is circumstantial evidence that Goodman was not the target of age discrimination, but rather that Alpough believed there were systemic problems within the group: Alpough, in his brusque manner, demanded everyone in the group change the way they had been performing. Alpough's comments also put into context additional statements Goodman contends are direct evidence of discrimination—accusations by Alpough Goodman was "stuck in the past" and "too slow" and Alpough needed someone with "more energy" handling the job, as well Blomer telling Goodman he needed to change the way he was doing my work, warning him "not to be a "dinosaur," and noting dinosaurs "had become extinct." Putting aside the inconsistencies in his testimony, even if made as Goodman now contends, those comments would be applicable regardless of an employee's chronological age—for example, to a 37-year-old employee who had been with the company for 12 years, but was no longer enthusiastic, motivated to perform diligently or willing to embrace a changing workplace or adapt to improve a support group that had been not functioning optimally. Indeed, Goodman admitted during his deposition he may have appeared to lack a sense of urgency. Extrapolating from these comments that Goodman was being

20

criticized because of his age, not performance deficiencies, requires inference and presumptions that render these statements circumstantial evidence at best, and very weak circumstantial evidence at that.

Alpough's direction to Goodman in early 2010 to find other work because Alpough had no work for him in space systems, while at the same time purportedly refusing to help him find another position within the company, was fully consistent with the reported deficiencies in his performance, and thus was not evidence, either direct or circumstantial, of pretext or discriminatory intent. Similarly, absent any specific statements about Goodman's age, the remedial steps taken as a result of his poor job performance (placement on a performance improvement plan and required tracking of daily tasks) provide no evidence of pretext or unlawful intent. Moreover, notwithstanding Goodman's assertion Alpough refused to help him find work, Goodman also advanced as direct evidence of intentional discrimination Alpough's statement to him, "I have already spoken to a number of directors. They don't want anything to do with you. They want somebody younger that would be on a career path." If the adverse employment action underlying Goodman's claims was the failure to appoint him to a position in any of those directors' business units, those statements might well be sufficient, without more, to meet Goodman's burden in opposing summary judgment. But, under a constructive discharge theory with Alpough's treatment of Goodman as the fulcrum, they are simply too remote. Moreover, Goodman concedes, when he asked Alpough point blank whether he was going to be laid off, Alpough assured him he would not be.

Finally, Goodman argues he was replaced by a much younger man, 30 year-old Juan Orozco, which he claims is direct evidence of Raytheon's discriminatory intent. Orozco had been hired during Goodman's last year of employment and had become his supervisor. Orozco, however, testified he only took over Goodman's responsibilities until a permanent replacement was hired six months later in January 2011. Although Orozco did not know the age of the replacement employee, a declaration from human resources manager Mark Shortt stated she was 53 years old. Whatever evidentiary value

21

there may be in Orozco's temporary assumption of Goodman's duties, it is, at best, weak circumstantial evidence of discriminatory animus.  (See *Guz*, *supra*, 24 Cal.4th at pp. 366-368.)

ii.  *Goodman failed to present specific, substantial circumstantial evidence of discriminatory animus*

To demonstrate pretext, circumstantial evidence ""must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate" on an improper basis.'"  (*Batarse v. Service Employees Internat. Union, Local 1000* (2012) 209 Cal.App.4th 820, 834.)  The evidence proffered by Goodman—that which he mislabeled "direct," discussed above, as well as that presented as circumstantial, when considered as a whole—is insufficient to permit a trier of fact to find by a preponderance of the evidence that intentional discrimination caused his constructive discharge.  (See *Guz, supra*, 24 Cal.4th at p. 361.)

In addition to the evidence reviewed in the preceding section, Goodman contends an inference of discrimination may be shown by an employer's deviation from ordinary personnel procedures in the aggrieved employee's case.  (See *Kotla v. Regents of University of California* (2004) 115 Cal.App.4th 283, 294, fn. 6.)  He argues the requirement that he record every task he performed daily was neither sanctioned by any written human resources policy or procedure nor required of any other employee. However, the deposition testimony by Mark Shortt, the person Raytheon designated as its person most knowledgeable about human resources policies and procedures, does not, as Goodman suggests, demonstrate Raytheon had deviated from ordinary personnel procedures by requiring Goodman to complete this task.  Shortt, who began working at Raytheon in May 2010, a few months before Goodman retired, testified he personally had never asked an employee to fill out a time-tracking form and was not aware of other employees asked to do so, but clarified, "I think the tool you're referring to has been used before.  I just have not personally used it.  So that was the question.  But there's not set policy around—I—again, think it goes back to the manager and human resources person

22

deciding what's best for that employee, what tools and resources would continue to help them develop and improve on areas . . . in a performance improvement plan."

Citing *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 479 (*Flait*) for the proposition pretext may be inferred from "the terminated employee's job performance before termination," Goodman contends a triable issue of material fact of pretext as to his 2009 evaluation is demonstrated by the fact he had either met or exceeded expectations in his previous 37 years of annual reviews. *Flait*, however, identified the terminated employee's job performance prior to termination as just one of several factors considered together from which pretext might be inferred: "Pretext may also be inferred from the timing of the company's termination decision, by the identity of the person making the decision, and by the terminated employee's job performance before termination." (*Ibid.*; accord, *Medina v. Multaler, Inc.* (C.D.Cal 2007) 547 F.Supp.2d 1099, 1130.) In that case Stuart Flait was terminated purportedly "because of his attitude toward company policy." (*Flait*, at p. 472.) Flait, however, had recently complained to John Pistner, "the sole person charged with the decision to terminate Flait's employment," about sexually offensive comments Pistner had been making to one of Flait's subordinates. The court held a reasonable trier of fact could conclude from evidence Flait had last complained a few months before Pistner decided to fire him, Flait had increased sales by 60 percent immediately prior to his termination, positive appraisals of his performance except for a "few verbal criticisms of his methods" and indication there was a possibility Flait would be promoted that the company's articulated reasons for terminating Flait's employment were "not worthy of credence." (*Id.* at p. 480; see *California Fair Employment & Housing Com. v. Gemini Aluminum Corp.* (2004) 122 Cal.App.4th 1004, 1024 [substantial evidence of employer's lack of credibility and company founder's authority and attitude combined with employee's excellent work record and timing of termination one week after he had complained his suspension was unfair because of religious needs would be sufficient to show pretext if employer's showing had been sufficient to shift burden to employee].)

Here, in contrast, the positive work evaluations were not made immediately prior to a termination decision. And, as discussed, there is ample evidence Goodman's recent performance was problematic, not stellar as was the employee's in *Flait.* Goodman's contention his performance was not objectively below average, citing Nourrcier's praise of him in June 2009 and positive statements in his 2009 review and some coworker evaluations that year, is misleading. The coworker evaluation forms and the annual performance reviews ask the "assessor" to identify both key strengths and development needs. Accordingly, one would necessarily expect to find affirmative statements in every review regardless of the overall rating. For example, Nourrcier's coworker evaluation for the year 2009, from which Goodman quotes, gave him a qualitative rating of only 4 notwithstanding it contained positive statements, including Goodman was "always accessible and responsive" and had a "[h]igh degree of ethics and integrity." Even a coworker evaluation by Brenda Cleary, which gave Goodman a qualitative rating of 2 for 2009, noted his key strength was "[k]nowledge of program ops."

Finally, Goodman contends pretext may be proved using comparative evidence. (See *Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 816.) He argues Alpough testified he had concerns about the performance of other people who attended the meetings during which Goodman was criticized, but none of them received a needs improvement rating that year. That testimony falls short of meeting Goodman's burden of demonstrating he was treated differently from other employees who were similarly situated in all relevant respects. (See *id.* at p. 817 ["comparative evidence of pretext . . . [is] evidence that [plaintiff] was treated differently from others who were similarly situated"]; see generally Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2013) ¶ 7:466, p. 7-84.9 (rev. # 1, 2011) ["The critical factor for comparative evidence is that the compared employees must be similarly situated in all respects to plaintiff. The burden is on plaintiff to make this showing."].)

In sum, even if we assume, contrary to the trial court's ruling, Goodman could prove the conditions of his employment were "intolerable" and he was constructively terminated, he failed to offer specific, substantial evidence that would permit a finding

the business justification for those conditions advanced by Raytheon were pretextual. (See *Morgan v. Regents of University of California, supra*, 88 Cal.App.4th at p. 69.) The mix of vague circumstantial evidence, subjective interpretation and inference and surmise offered in his opposition papers failed to raise a triable issue that Raytheon had acted with discriminatory animus. (See *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 816 ["an employee's subjective personal judgments of his or her competence alone do not raise a genuine issue of material fact"]; see also *Hersant v. Department of Social Services*, *supra*, 57 Cal.App.4th at p. 1005 [to defeat summary judgment after employer has presented substantial evidence of a legitimate nondiscriminatory reason for its decision, "[i]t is not enough for the employee simply to raise triable issues of fact concerning whether the employer's reasons for taking the adverse action were sound. What the employee has brought is not an action for general unfairness but for [racial] discrimination"].) Goodman was unable to present "evidence supporting a rational inference that *intentional discrimination, on grounds prohibited by* [FEHA] *was the true cause* of [Raytheon's] actions." (*Guz, supra*, 24 Cal.4th at p. 361.) Summary judgment was properly granted as to the discrimination cause of action.

3. *Goodman's Harassment/Hostile Work Environment Claim Fails Because He Did Not Present Evidence of Age-related Conduct Creating an Abusive Working Environment*

Pursuant to section 12940, subdivision (j)(1), it is unlawful for "an employer . . . or any other person, because of . . . age . . . to harass an employee . . . ." "'[A]n employee claiming harassment based upon a hostile work environment must demonstrate that the conduct complained of was *severe enough or sufficiently pervasive* to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees *because of their* [*age*]." (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 279 [discussing sexual harassment claim]; see *Cozzi v. County of Marin* (N.D.Cal. 2011) 787 F.Supp.2d 1047, 1069 [plaintiff must show he or she "was subjected to verbal or physical conduct of an age-related nature, that the conduct was unwelcome, and that the conduct was sufficiently severe or pervasive to alter the

25

conditions of [his or] her employment and create an abusive work environment"].) As with other harassment claims, to be pervasive, the offensive conduct must consist of "more than a few isolated incidents." (*Lyle,* at p. 284; see *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1043 ["[t]here is no recovery 'for harassment that is occasional, isolated, sporadic, or trivial'"].)

For purposes of his discrimination claim, we accepted without deciding that a jury could find Goodman faced objectively intolerable working conditions following Alpough's appointment as director of the space systems supply chain in July 2009 so his retirement could be seen as involuntary. Goodman's constructive discharge theory, however, was based primarily on those actions taken by Raytheon to remedy his poor job performance—criticism of his work, placement on a performance improvement plan that made him ineligible for annual salary increases, and the requirement that he record his daily activities and the time taken to complete each task—not the often ambiguous oral comments he identified (that is, references to the need for "young blood" and his own lack of energy). As discussed, Goodman failed to present specific and substantial evidence that would permit a finding the legitimate business justification advanced by Raytheon for imposing those remedial requirements was pretextual. Accordingly, however unpleasant those conditions may have been, they were not part of an abusive work environment created because of Goodman's age and are irrelevant to his claim of harassment. What is left—largely isolated comments regarding (perhaps) age combined with Alpough's generally disrespectful management style—is insufficient to establish conduct severe enough or sufficiently pervasive to be actionable. (See *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1054-1055 ["[m]inor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable"]; *Lyle v. Warner Brothers Television Productions, supra*, 38 Cal.4th at p. 292; *Brennan v. Townsend & O'Leary Enterprises, Inc.* (2011) 199 Cal.App.4th 1336, 1353-1354.)

26

4. *Goodman's Retaliation Claim Fails Because He Presented No Evidence He Had Engaged in Protected Activity That Led to an Adverse Employment Action*

To establish a prima facie case of retaliation under FEHA, a plaintiff must show he or she engaged in protected activity, the employer subjected the employee to an adverse employment action and a causal link existed between the protected activity and the employer's action. (*Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at p. 1042; see *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 287-288.) Once an employee establishes a prima facie case, the burden shifts to the employer to offer a legitimate, nonretaliatory reason for the adverse employment action. (*Yanowitz*, at p. 1042 [adopting the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, *supra*, 411 U.S. at pp. 802-805].) If the employer produces a legitimate business reason for the adverse employment action, "the presumption of retaliation ""'drops out of the picture,'"" and the burden shifts back to the employee to prove intentional retaliation." (*Yanowitz,* at p. 1042; see also *Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1004.)

In his complaint Goodman alleged "his complaints about discrimination and harassment because of his age were a factor in defendant's constructive termination of his employment." Yet at his deposition Goodman could not remember ever telling anyone at Raytheon's human resources department that age was being used against him—testimony highlighted by the trial court in granting Raytheon's motion as to this cause of action due to Goodman's failure to present evidence he had, in fact, engaged in protected activity, as well as his inability to demonstrate a causal connection between any complaints he had made and his negative performance ratings and the consequences that followed those ratings. In its respondent's brief Raytheon directed this court to evidence before the trial court confirming its understanding of the record.

Goodman does not directly respond to these points in either his opening or reply brief, arguing only the evidence of pretext and discrimination advanced in connection with his first cause of action also constitutes evidence he experienced retaliation. As we

discussed, that evidence is insufficient to create a triable issue of material fact as to intentional discrimination. It is also insufficient to salvage Goodman's retaliation claim.

### 5. *Goodman's Wrongful Termination Claim Fails for the Same Reason as His FEHA Discrimination Claim*

Goodman's cause of action for wrongful termination in violation of public policy, although initially based on a claimed violation of Labor Code section 1102.5, is now grounded on his contentions he was constructively terminated by Raytheon because of his age and the employment conditions he purportedly found intolerable were not imposed because of his own deficient performance. For the reasons discussed above, Raytheon demonstrated it had legitimate, nondiscriminatory business reasons for the remedial steps it took. Accordingly, as with his discrimination claim, the trial court properly granted summary judgment on the wrongful termination cause of action.

### 6. *Goodman's Breach of Contract Action Also Fails Because Raytheon Had Legitimate, Nondiscriminatory Reasons for the Remedial Steps Goodman Asserts as a Constructive Discharge*

Labor Code section 2922 establishes a presumption of at-will employment if the parties have made no express oral or written agreement specifying the length of employment or the grounds for termination: "An employment, having no specified term, may be terminated at the will of either party on notice to the other. . . ." The statutory presumption of at-will employment, however, is subject to limitations. "The statute does not prevent the parties from *agreeing* to any limitation, otherwise lawful, on the employer's termination rights. [Citation.] [¶] One example of a contractual departure from at-will status is an agreement that the employee will be terminated only for good cause [citation], in the sense of ""'a fair and honest cause or reason, regulated by good faith . . . ,'" as opposed to one that is "trivial, capricious, unrelated to business needs or goals, or pretextual . . . .""" (*Guz, supra*, 24 Cal.4th at pp. 335-336; see *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 677.)

Although Raytheon's employee handbook stated all employment with the company was at-will and there was no written agreement between Raytheon and Goodman in any way altering the at-will relationship, Goodman asserted, based on his

length of employment, his exemplary work record, his merit raises and promotions and a purported oral assurance of continued employment (from an unnamed person at some unknown time), there was either an express or implied promise his employment would not be terminated except for good cause. Even accepting the dubious premise Goodman raised a triable issue of material fact on this point (see, e.g., *Guz, supra*, 24 Cal.4th at p. 342 ["[a]bsent other evidence of the employer's intent, longevity, raises and promotions are their own rewards for the employee's continuing valued service; they do not, *in and of themselves*, additionally constitute a contractual guarantee of future employment security"]), and, as before, assuming without deciding the conditions of his employment following his deficient performance ratings constituted a constructive discharge, Raytheon presented extensive evidence it had good cause to impose those conditions based on its evaluations of Goodman's work. Because Goodman failed to present adequate evidence those reasons were pretextual, summary judgment was properly granted as to his contract claim.

## DISPOSITION

The judgment is affirmed. Raytheon and Alpough are to recover their costs on appeal.

PERLUSS, P. J.

We concur:

WOODS, J.

ZELON, J.

29