[No. E027170. Fourth Dist., Div. Two. May 8, 2001.]

WENDY SLATKIN, Plaintiff and Appellant, v.
UNIVERSITY OF REDLANDS, Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and V.

## COUNSEL

Law Offices of Barbara Metzger Kay, Barbara Metzger Kay and Judith K. Williams for Plaintiff and Appellant.

Musick, Peeler & Garrett, Steven D. Weinstein and Stuart D. Tochner for Defendant and Respondent.

## OPINION

**RICHLI, J.**—Academic catfighting or anti-Semitism? Dr. Wendy Slatkin claims the University of Redlands (the University) refused to grant her

tenure because she is Jewish. The University responds that it refused to grant her tenure because of perceived deficiencies in her teaching. Unfortunately for the University, there was evidence that several of the people involved in the tenure decision were prejudiced against her. Fortunately for the University, the same evidence showed they were prejudiced against her as a matter of academic politics, rather than anti-Semitism. Dr. Slatkin introduced no admissible evidence that anti-Semitism played any role in the denial of tenure. The trial court granted the University's motion for summary judgment. We will affirm.

I

### FACTUAL BACKGROUND

The following facts are taken from the papers filed in support of and in opposition to the University's motion for summary judgment. Consistent with the applicable standard of review, we view the evidence in the light most favorable to the party opposing the motion—i.e., in this case, to Dr. Slatkin. (*Davis v. Marin* (2000) 80 Cal.App.4th 380, 382, fn. 1 [94 Cal.Rptr.2d 896].)

As will be seen, there are issues regarding the admissibility of some of the evidence Dr. Slatkin offered in opposition to the motion. For purposes of this statement of facts, however, we assume all such evidence was admissible.

In spring 1986, Dr. Slatkin first went to work for the University, teaching art history part-time. In fall 1992, she began teaching full-time; however, this was not a tenure track position.

In 1993, Philip A. Glotzbach, dean of the college of arts and sciences, offered Dr. Slatkin a tenure track position as associate professor in the art department. In July 1993, the University and Dr. Slatkin entered into an employment contract for the 1993-1994 academic year, renewable for the 1994-1995 academic year; it provided that, in fall 1995, she would be considered for tenure.

The University had three criteria for tenure decisions, which were set forth in the faculty handbook: (1) teaching, (2) research, and (3) University (including departmental) service.

In spring 1994, Dr. Slatkin received a tenure track review. Both Dean Glotzbach and Dr. Penny A. McElroy recommended her enthusiastically, and her employment contract was renewed.

In the fall of 1995, Dr. Slatkin applied for tenure. The University's deadline for the submission of information pertinent to the tenure decision was October 30, 1995.

On October 27, 1995, Dr. McElroy, who had become the chair of the art department, submitted a letter on behalf of the entire department supporting Dr. Slatkin for tenure. She praised Dr. Slatkin's research and her University service. Of Dr. Slatkin's teaching, however, she said: "In the classroom, Wendy is a lively and entertaining lecturer. In her student evaluations she earns high praise for her knowledge and command of the subject. Students respond to her sense of humor and appreciate her availability and willingness to help them . . . . A majority of student evaluations express this judgment. Paradoxically, there is also a pattern in the evaluations that characterizes the course as not very interesting or stimulating. This pattern exists in evaluations [th]at are generally otherwise favorable as well as in those that are less positive overall.[1] Other observed patterns in the evaluations include a desire on the part of some students for a more clear sense of how they are being evaluated, and more opportunities to interact rather than passively listen. Our visits to the classroom confirm the existence of this paradox. We honor and rely upon Wendy's strengths as a teacher, and hope that she will work on creating a more interactive and stimulating classroom environment."

Regarding departmental service, she said: "The vigor that we observe in Wendy's work on University service also is apparent to us in our work in the department. . . . The other side of all this energy and enthusiasm is a distinct lack of listening skills. . . . [S]ometimes Wendy is so intent on pursuing her own solution to a problem, she doesn't appear to hear other opinions, sometimes talking directly over her colleagues."

Dr. McElroy testified that, while she supported Dr. Slatkin for tenure, she "had reservations about her ability to interact harmoniously with others, accept criticism, and achieve goals of excellence in her teaching by modifying her teaching methods to increase the interest of her students."

At the same time, Raúl Acero, another professor in the art department, was also up for tenure. On October 30, 1995, Dr. Slatkin submitted a letter ostensibly supporting Acero for tenure. However, she also said:

"Unfortunately, Ra[ú]l has participated in generating an environment in departmental meetings which makes frank and honest discussion difficult.

---

[1]Dr. Slatkin testified that there was no pattern of student evaluations characterizing her as either unstimulating or uninteresting. "[T]here were a few sprinkled here and there. But they were always embedded in a group that was very positive."

He has informed me that, in his opinion, I don't 'listen' to him. Since I have made a concerted effort to respect my colleagues's [sic] opinions, I interprete [sic] this position as both an inability to recognize genuine differences of opinion as well as his difficulty with clear verbal articulation. [¶] . . . [¶]

"Ra[ú]l's geographical move to Redlands, from New York City, . . . has been very disruptive for his career as a sculptor. He has consistently felt pressure to produce works of sculpture, a time[-]consuming activity, in order to have new works to exhibit to rebuild a professional life in this region. [¶] . . . [¶]

"[T]he University has assisted his financial situation by hiring his wife . . . . The commitment to employ [her] . . . came directly from the Dean's office, and not through 'normal' departmental channels. [Her] performance as a ceramics instructor[] is clearly not relevant to the decision on Ra[ú]l's tenure. I mention this issue[] only because it is another example of the institutional support Ra[ú]l Acero has enjoyed from this University.

"In return, Ra[ú]l has agreed to serve on several committees when invited to do so. As far as I know, . . . he has not volunteered for any university service."

On November 2, 1995—i.e., after the deadline—Acero submitted a letter in which he refused to support Dr. Slatkin for tenure; he criticized her teaching and departmental service.

On November 6, 1995—i.e., after the deadline—Dr. McElroy submitted a second letter, this time recommending that Dr. Slatkin be denied tenure. She later explained: "Ms. Slatkin's letter made it clear to me that she would not be able to interact effectively with her colleagues or achieve excellence in teaching, due to her inability to accept criticism. This incident tipped the balance against Ms. Slatkin in what had previously been a decision to recommend her for tenure."

The faculty review committee voted narrowly, 6 to 4, to award Dr. Slatkin tenure. Dean Glotzbach, however, denied tenure.[2] He explained: "[A]lthough her student evaluations are generally favorable to strong and she receives support from some colleagues who comment favorably on her teaching, sufficient questions concerning the level at which classes are taught and her willingness to subject her teaching to critical analysis to [sic] warrant an unfavorable tenure decision."

Dr. Slatkin appealed the denial. An appeals committee recommended that the denial of tenure be reversed and that Dr. Slatkin be granted tenure. It

---

[2]Nominally, Dean Glotzbach merely made a recommendation to the board of trustees. In practice, however, his negative recommendation constituted the denial of tenure.

found that Dr. Slatkin's letter regarding Acero "responded appropriately to the requirements for faculty evaluation . . . ." Nevertheless, "the principal reason for [Dr. McElroy and Acero's] decision to change their recommendation was . . . Slatkin's letter about . . . Acero." Dean Glotzbach, Dr. McElroy, and Acero had all applied "the unapproved criterion of collegiality . . . ." The appeals committee concluded that Dean Glotzbach had improperly placed more weight on Dr. McElroy's second letter ("written after the deadline in <u>anger</u>") and Acero's letter (by a still untenured professor) than on Dr. McElroy's first letter, the opinions of the remainder of the art department, and the majority vote of the faculty review committee.

Based on the appeals committee's recommendation, James R. Appleton, president of the University, overruled the denial of tenure. However, he did not grant tenure. He explained: ". . . I feel strongly about the faculty review process, and have opted not to make a decision independent of a substantive review by the Faculty Review committee and the Dean." Rather, he advised Dr. Slatkin that she could apply for tenure again in either 1996-1997 or 1997-1998.

On May 6, 1996, Dean Glotzbach met with Dr. Slatkin to discuss how she could improve her chances of obtaining tenure. He recommended that she teach for another year before she reapplied for tenure, "so that she could demonstrate that she had addressed the performance issues that [had been] raised . . . ."

Instead, Dr. Slatkin reapplied immediately. She acknowledged that her tenure packet was "fundamentally unchanged."

Dean Glotzbach held a "highly unusual" meeting with the members of the art department to discuss Dr. Slatkin. She was not invited to the meeting nor given any notice of it. Dean Glotzbach then summarized the meeting in a memo, which was highly critical of Dr. Slatkin, and which he placed in her tenure dossier. He advised Dr. Slatkin that she had a right to reply. She submitted a written reply, but it was never placed in her tenure dossier.

Once again, Dean Glotzbach denied tenure. He explained:

"Some departmental colleagues . . . have serious concerns about Professor Slatkin's teaching, charging that she does not engage students in analytical, critical thinking about art history and does not encourage independent thinking about the history of art, but rather presents a narrow perspective and expects students to reiterate it. They complain that Professor Slatkin does not elicit thoughtful discussion in the classroom but only responses reflective of

her own or the texts' perspectives. Finally, they suggest that Slatkin has not shown herself capable of critical reflection about her teaching or effective adjustment of her teaching methods. [¶] . . . [¶]

"[W]hat changes she has made have not been sufficient to address the concerns that have been raised, and other colleagues have expressed the worry that even these recent changes may be merely cosmetic and not self-motivated. [¶] . . . [¶]

"Some of her colleagues . . . complain that Professor Slatkin takes a self-interested approach toward departmental affairs; they assert that she is volatile, does not listen well to differing opinions, undermines the authority of the chair, and has not been dependable in contributing her fair share to the resolution of departmental business."

Dr. Slatkin appealed again. Among her contentions was that Dean Glotzbach had "creat[ed] a hostile work environment . . . ." Under this general heading, she contended that "there is an element of anti-[S]emitic animus which is the subtext of these allegations and mis-characterizations of my work."

This time, an appeals committee concluded "that the letter of the law was sufficiently observed in Dr. Slatkin's review that we do not find that her negative tenure decision can be reversed on the basis of procedure or inadequate consideration." It found that most of the allegations Dr. Slatkin had made in her appeal had been refuted. It did not address her "hostile work environment" allegations, however, because it concluded these were "outside the scope of the Appeals Committee to consider."

At the same time, the appeals committee concluded "that Dr. Slatkin did not receive a wholly fair and unbiased review . . . ." In a section entitled, "A prejudiced dean?," it announced it was "uneasy" and "unhappy" about several incidents which "could be construed to suggest that [Dean Glotzbach] did not work to create a strong dossier on Dr. Slatkin's behalf . . . ." Among these was the inclusion of Dean Glotzbach's critical memo, but not Dr. Slatkin's reply, in the dossier. It therefore recommended that Dr. Slatkin "should be allowed to try for tenure again in about three years."

President Appleton accepted the appeals committee's recommendation that the denial of tenure should stand. He overruled its recommendation that Dr. Slatkin should be allowed to seek tenure again, stating three reasons: "First, the Appeals Committee addressed each of the bases for [the] appeal . . . and found there was no basis for rehearing or reversal even if the

Dean's activities were inappropriate . . . . [¶] Second, upon my independent review, I find the premise that the Dean's role was prejudicial cannot be substantiated. . . . [¶] Third, I do not find that the Dean's actions were in conflict with University procedures." This was the first time President Appleton had ever overruled an appeals committee's recommendation.

Both Dean Glotzbach and Dr. McElroy testified that Dr. Slatkin's religion played no part in their recommendations that she be denied tenure.

II

PROCEDURAL BACKGROUND

Dr. Slatkin asserted four causes of action: (1) breach of implied contract, (2) breach of implied covenant of good faith and fair dealing, (3) employment discrimination, and (4) fraud. In her employment discrimination cause of action, she alleged that the University had violated the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) by denying her tenure because she was a Jew.

The University moved for summary judgment on all causes of action. Dr. Slatkin opposed the motion with respect to her first three causes of action, but not with respect to her fourth (fraud) cause of action. The trial court granted the motion. Accordingly, it entered judgment for the University and against Dr. Slatkin.

In this appeal, Dr. Slatkin raises no issue with respect to her first two causes of action. She challenges only the summary judgment on her FEHA cause of action.

III

EVIDENTIARY ISSUES*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV

SHOWING OF PRETEXT

Dr. Slatkin contends there was a triable issue of fact as to whether the University's claimed reasons for denying her tenure were pretextual, and hence as to whether its actual reason was religious discrimination.

*See footnote, *ante*, page 1147.

■ ". . . California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination . . . based on a theory of disparate treatment. [Citations.]" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 [100 Cal.Rptr.2d 352, 8 P.3d 1089], fn. omitted.) This is commonly known as the *McDonnell Douglas* test (*ibid.*), after *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668].

" 'First, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. The employer then must offer a legitimate nondiscriminatory reason for the adverse employment decision. Finally, the plaintiff bears the burden of proving the employer's proffered reason was pretextual. [Citations.]' [Citation.]" (*Le Bourgeois v. Fireplace Manufacturers, Inc.* (1998) 68 Cal.App.4th 1049, 1058 [80 Cal.Rptr.2d 660], fn. omitted, quoting *Brundage v. Hahn* (1997) 57 Cal.App.4th 228, 236 [66 Cal.Rptr.2d 830].)

"However, like all other defendants, the employer who seeks to resolve the matter by summary judgment must bear the initial burden of showing the action has no merit. [Citation.] The employer carries its burden if, inter alia, it 'establish[es] an undisputed legitimate, nondiscriminatory basis for [the employment decision.]' [Citation.] Absent 'substantial responsive evidence . . . of the untruth of the employer's justification or a pretext, a law and motion judge may summarily resolve the discrimination claim.' [Citation.]" (*Le Bourgeois v. Fireplace Manufacturers, Inc., supra,* 68 Cal.App.4th at p. 1058, quoting *Valdez v. City of Los Angeles* (1991) 231 Cal.App.3d 1043, 1051 [282 Cal.Rptr. 726], and *University of Southern California v. Superior Court* (1990) 222 Cal.App.3d 1028, 1039 [272 Cal.Rptr. 264]; accord, *Guz v. Bechtel National, Inc., supra,* 24 Cal.4th at pp. 357, 362.)

■ Here, the University introduced evidence that it relied on legitimate, nondiscriminatory reasons in denying Dr. Slatkin tenure. Some of this consisted of evidence that Dean Glotzbach, Dr. McElroy, and others found Dr. Slatkin both uninspiring as a teacher and uncooperative as a colleague; they also found her unable to accept criticism, and hence unlikely to improve.

Certainly there was evidence that the claimed reliance on Dr. Slatkin's supposed professional weaknesses was pretextual. For example, Dr. Slatkin introduced evidence that student evaluations of her, on which Dr. McElroy purportedly relied, were actually "very positive." All such evidence of pretext, however, overwhelmingly indicated that the *real* reason was lingering resentment over *l'affaire* Acero.

Dr. Slatkin therefore argues that evidence of pretext is tantamount to evidence of discrimination. As she puts it, "rejection of a defendant employer's proffered nondiscriminatory business reason as incorrect is ordinarily evidence the employer was concealing an unlawful motive." We disagree.

First, Dr. Slatkin's argument "impl[ies] that the employer's 'proffered explanation,' his 'stated reasons,' his 'articulated reasons,' somehow exist *apart from the record*—in some pleading, or perhaps in some formal, nontestimonial statement made on behalf of the defendant to the factfinder. . . . Of course it does not work like that. The reasons the defendant sets forth are set forth 'through the introduction of admissible evidence.' [Citation.] In other words, the defendant's 'articulated reasons' *themselves* are to be found 'lurking in the record.' " (*St. Mary's Honor Center v. Hicks* (1993) 509 U.S. 502, 522-523 [113 S.Ct. 2742, 2755, 125 L.Ed.2d 407].) Here, the University understandably might not want to argue that the tenure decision involved academic politics. Nevertheless, we may treat academic politics as a "proffered" reason, not merely as evidence that the University's other "proffered" reasons were a pretext for discrimination.

■ Second, even if pretext is shown, "an inference of intentional discrimination cannot be drawn solely from evidence, if any, that the company lied about its reasons. The pertinent statutes do not prohibit lying, they prohibit discrimination. [Citation.] Proof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons. [Citation.] Still, there must be evidence supporting a rational inference that *intentional discrimination, on grounds prohibited by the statute, was the true cause* of the employer's actions. [Citation.]" (*Guz v. Bechtel National, Inc.*, *supra*, 24 Cal.4th at pp. 360-361; accord, *St. Mary's Honor Center v. Hicks*, *supra*, 509 U.S. at pp. 514-515 [113 S.Ct. at p. 2751] ["[N]othing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable"].)

A personal grudge can constitute a "legitimate, nondiscriminatory reason" for an adverse employment decision. "[I]f nondiscriminatory, [the employer]'s true reasons need not necessarily have been wise or correct. [Citations.] While the objective soundness of an employer's proffered reasons supports their credibility [citation], the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*. Thus, 'legitimate' reasons [citation] in this context are reasons that are *facially unrelated to prohibited*

*bias*, and which, if true, would thus preclude a finding *of discrimination.* [Citations.]" (*Guz v. Bechtel National, Inc., supra,* 24 Cal.4th at p. 358, fn. omitted.) ■ The fact that the University prohibited the use of "collegiality" as a criterion for tenure does not turn covert reliance on it into evidence of discrimination. To the contrary, it shows why Dean Glotzbach and Dr. McElroy might have concealed their real reason, even if it was *not* discriminatory.

There was no evidence that any lingering resentment was, itself, a pretext for religious discrimination. To the contrary, it seems to have been all too genuine. Both Dean Glotzbach and Dr. McElroy supported Dr. Slatkin enthusiastically, until she wrote her letter regarding Acero. It was Dean Glotzbach who offered her a tenure track position in the first place. During her tenure track review, both Dean Glotzbach and Dr. McElroy unreservedly supported the renewal of her contract. Dr. Slatkin admitted that, before the Acero letter, her relationship with Dr. McElroy was "cordial and collegial." Likewise, before the Acero letter, Dean Glotzbach assured her "that he was supporting [her] tenure bid." " '[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, . . . a strong inference arises that there was no discriminatory motive.' [Citations.]" (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 809 [85 Cal.Rptr.2d 459], quoting *Bradley v. Harcourt, Brace and Co.* (9th Cir. 1996) 104 F.3d 267, 270-271.)

We recognize that "[*i*]*n an appropriate case*, evidence of dishonest reasons, *considered together with the elements of the prima facie case*, may permit a finding of prohibited bias. [Citations.]" (*Guz v. Bechtel National, Inc., supra,* 24 Cal.4th at p. 356, italics added.) We question, however, whether this is "an appropriate case." Here, all the evidence that the University's claimed reasons were dishonest pointed equally to the conclusion that its true reasons were nondiscriminatory.

We even question whether Dr. Slatkin introduced sufficient evidence to establish a prima facie case of discrimination. ■ "Generally, the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive. [Citations.]" (*Guz v. Bechtel National, Inc., supra,* 24 Cal.4th at p. 355, fn. omitted; see also *Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248, 253 [101 S.Ct. 1089, 1094, 67 L.Ed.2d 207] ["The plaintiff must prove by a preponderance of the

evidence that she . . . was rejected under circumstances which give rise to an inference of unlawful discrimination"].)

■  Here, there was insufficient evidence of a discriminatory motive. The report of the second appeals committee, which questioned whether Dean Glotzbach was "prejudiced" against Dr. Slatkin based on certain "concrete examples of discriminatory behavior," was not properly authenticated. Hence, it was inadmissible hearsay. Even if admissible, however, this evidence, like other evidence that University procedures were violated, showed, at most, that Dean Glotzbach, Dr. McElroy, and possibly President Appleton[4] were "prejudiced" against Dr. Slatkin. It did not show *why* they were prejudiced. The appeals committee did not consider, and did not make any findings on, Dr. Slatkin's charges of anti-Semitism. On this record, no reasonable juror could conclude that such "prejudice" was based on her religion rather than on the Acero incident. (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1117-1118 [75 Cal.Rptr.2d 27] [incident in which plaintiff's supervisor berated him loudly and aggressively showed "unwarranted hostility," but "mere fact [supervisor] is a female and plaintiff a male does not give rise to the inference that her alleged aggressive conduct was motivated by a desire to discriminate on the basis of gender"].)

As we discussed in an unpublished portion of this opinion, the trial court properly disregarded nearly all of Dr. Slatkin's proffered evidence of anti-Semitic animus as inadmissible. What little remained was insufficient. First, there was evidence that Dr. Slatkin was unable to attend a faculty retreat because it was scheduled on the Jewish high holidays. This was insufficient to show religious discrimination. FEHA forbids "an employer . . . to discriminate against a person in compensation or in terms, conditions, or privileges of employment because of a conflict between the person's religious belief or observance and any employment requirement, unless the employer . . . demonstrates that it has explored any available reasonable alternative means of accommodating the religious belief or observance, including the possibilities of excusing the person from those duties that conflict with his or her religious belief or observance . . . ." (Gov. Code, § 12940, subd. (*l*).) Here, the University did in fact excuse Dr. Slatkin from her conflicting duties. There was no indication that she was disadvantaged by her nonattendance.

In *Lawrence v. Mars, Inc.* (4th Cir. 1992) 955 F.2d 902, certiorari denied 506 U.S. 823 [113 S.Ct. 76, 121 L.Ed.2d 40], the employer scheduled an

---

[4]The fact that President Appleton had never previously reversed an appeals committee's recommendation was shown only by an unauthenticated hearsay document.

important managers' conference during Rosh Hashanah. The plaintiff used two days of vacation time to observe Rosh Hashanah. When he returned, a fellow employee told him, by way of "friendly advice," that there was no excuse for missing the conference. (*Id.*, at p. 904.) About six weeks later, he was terminated. (*Id.*, at p. 905.) The federal appellate court held the plaintiff had failed to present sufficient "direct or indirect evidence from which a trier of fact could infer religious discrimination." (*Id.*, at p. 906.) We conclude that scheduling a significant business event during the high holidays is not evidence of discriminatory animus.

Dr. Slatkin also did not teach on the high holidays. She did not claim that she suffered any adverse consequences. She did testify that she heard "comments" about this, but there was no evidence as to who made these comments. Similarly, Dr. Slatkin testified that that a science department member had told her that Dr. Jodye Selco—a Jewish chemistry professor—was "abrasive," "defensive, "volatile" and/or "aggressive." There is no basis for concluding that any of these comments were anti-Semitic.[5] This is all the more true of the comments that Dr. Selco was "different" or that the speaker did not like her. In any event, an isolated remark by a person not involved in the adverse employment decision "is entitled to virtually no weight in considering whether the firing was pretextual or whether the decisionmaker harbored discriminatory animus." (*Horn v. Cushman & Wakefield Western, Inc., supra*, 72 Cal.App.4th at p. 809.)

In summary, then, the evidence showed that the University denied Dr. Slatkin tenure for one of two reasons (or both): either (1) she did not deserve it, or (2) her colleagues could not forgive her for making negative comments about Acero. There was no admissible evidence that the University actually denied Dr. Slatkin tenure based on anti-Semitic bias against her. We conclude that the trial court properly granted summary judgment.

V

DENIAL OF A CONTINUANCE TO COMPLETE DISCOVERY*

. . . . . . . . . . . . . . . . . . . . . . .

[5]Milton LaPointe, the manager of the University's Equal Opportunity Program, found that Dr. Selco was "a colleague with whom it is difficult to interact without rancor, unnecessarily confrontational," and "generally inconsiderate with colleagues." We, in an unpublished portion of this opinion, held that his memorandum was both unauthenticated and inadmissible hearsay. It points up the problem, however, in concluding that Dr. Selco's colleague was expressing anti-Semitism rather than anti-Selcoism.

*See footnote, *ante*, page 1147.

## VI

### DISPOSITION

The judgment is affirmed. The University shall recover costs against Dr. Slatkin.

Ramirez, P. J., and Gaut, J., concurred.