Filed 10/15/25  Herskovitz v. Snowflake CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| STEVEN HERSKOVITZ,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SNOWFLAKE, INC.,<br><br>    Defendant and Respondent. | A171051<br><br>(San Mateo County<br>Super. Ct. No. 21CIV00580) |

Steven Herskovitz appeals from the trial court's entry of judgment in favor of Snowflake, Inc. (Snowflake), his former employer.  The court dismissed Herskovitz's two age discrimination claims after granting Snowflake's renewed motion for summary judgment.  Herskovitz alleged Snowflake terminated him based on his age in violation of both the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) and public policy.

For the same two reasons, Herskovitz argues the trial court erred:  In dismissing, the court (1) applied the wrong legal standard for evaluating whether he met his burden in opposing Snowflake's motion, and (2) exceeded its authority to determine factual merit on summary judgment.  We conclude these arguments are without merit.  The court applied the correct legal standard and properly granted summary judgment because of

the lack of any evidence from which it can be permissibly inferred that, in terminating Herskovitz's employment, Snowflake was motivated by age discrimination.

Accordingly, we will affirm.

## I. BACKGROUND

### A. *Heskovitz's Complaint Allegations*

In February 2021, Herskovitz filed a complaint alleging three causes of action against Snowflake[1]—two for age discrimination under the FEHA (one for disparate treatment because of his age and one for disparate impact because of stock options he held) and a third for age discrimination in violation of public policy. He alleged he was one of the founding employees at Snowflake, incorporated in 2012, and that he rose to the position of Snowflake's Vice President of Global Sales Engineering because of his outstanding work, which management repeatedly recognized and rewarded.

Herskovitz further alleged that a new Chief Executive Officer (CEO) took over Snowflake in April 2019. A day or two later, the CEO told everyone the previous management had been too generous with stock options. A week later, Herskovitz, then 62 years old, was demoted to " 'VP Global Expansion' " and replaced by Eve Besant, a much younger employee whom he had hired and trained.

Moreover, Snowflake did not provide sufficient support for Herskovitz's first assignment in his new position, which was to move to Japan to develop a market for Snowflake's products there. Then, when he

---

[1] Herskovitz also sued Snowflake Computing, Inc., but alleged that it and Snowflake, Inc. might function as one. Only Snowflake, Inc. moved for summary judgment and it alone is referred to in the trial court's judgment and by the parties on appeal. Therefore, we do not discuss Snowflake Computing, Inc.

returned to the United States, he was told he had to find another position within the company. Despite his diligent search, and the availability of positions for which he was highly qualified, no one hired him. He was terminated in May 2020 and his unvested stock options, worth over $17 million, were cancelled.

Herskovitz alleged his age and stock options were substantial factors in Snowflake's adverse employment actions against him, and that Snowflake fired him while disguising these true motives for doing so. He sought compensatory damages in excess of $15 million dollars and punitive damages.

## B. *Snowflake's Motions for Summary Judgment*

In June 2023, Snowflake moved for summary judgment or, in the alternative, summary adjudication. It contended that it replaced Herskovitz with Besant because she was experienced in scaling a sales engineering organization and more suited for its new management's priorities. According to Snowflake, Herskovitz's search for a new assignment was unsuccessful for non-discriminatory reasons, including challenges brought about by the outbreak of the COVID-19 global pandemic. After Herskovitz was unable to find another position within the company, his employment was terminated.

Herskovitz opposed summary judgment on the grounds that he established a prima facie case for age discrimination, Snowflake's proffered reasons for its actions against him were pretextual, and substantial evidence supported the inference that its actions were motivated by age discrimination. He contended he was well qualified from his years of growing Snowflake's Sales Engineering organization to scale it—more so than Besant; that his work in Japan failed because Snowflake had not

3

properly supported it; and that he was well qualified for other positions within Snowflake but was not hired for any of them.

The trial court denied Snowflake's motion for summary judgment. It granted Snowflake's motion for summary adjudication on the second cause of action (for age discrimination based on disparate impact regarding the stock options) and otherwise denied it.[2]  While the court concluded Snowflake met its initial burden of showing it acted for nondiscriminatory reasons, it ruled that Herskovitz raised a triable issue of fact regarding whether Snowflake's stated reasons for its actions were pretextual, which permitted an inference of age discrimination.

In October 2023, Snowflake filed a "renewed" motion for summary judgment or summary adjudication based on Herskovitz's tardy discovery production of a text message he sent to another Snowflake employee on May 7, 2020, shortly before his employment termination, in which he stated he was a "builder," not a "scaler."  Snowflake challenged Herskovitz's remaining two causes of action on much the same grounds as it did in its initial motion.  Herskovitz opposed the motion on much the same grounds as he did before, and contended his May 2020 text message did not show anything material.

At the hearing on Snowflake's renewed motion, the trial court explained that it had applied an incorrect burden-shifting standard.  Upon Snowflake meeting its initial burden as movant, the court said, the correct standard called for Herskovitz to put forward "evidence of discrimination besides the fact that Mr. Herskovitz was replaced by a younger employee."

_____

[2] Herskovitz does not challenge the trial court's dismissal of his second cause of action, so we do not discuss it further.

4

Finding no such evidence this time, the court granted Snowflake summary judgment.[3]

In its written order, originally issued as a tentative ruling, the trial court further explained its decision: "The court . . . sua sponte reconsiders its ruling on defendant's previous motion . . . . During the argument . . . Plaintiff argue[d] that he need[ed] to establish only falsity. [¶] . . . [T]he court agreed with plaintiff at the first hearing, [but] the court now believes that it was incorrect. Plaintiff has the burden of demonstrating evidence that the reason was false and [a product] of discrimination. (*Hicks v. KNTV Television, Inc.* [(2008)] 160 Cal.App.4th 994, 1003.) Here, plaintiff shows that he is in a protected classification and that he was replaced by a younger person. That fact alone is insufficient to defeat this summary judgment motion. There is no other evidence that can support, either directly or inferentially, that there was discrimination."

The court found Snowflake met its initial burden to show nondiscriminatory reasons for its actions. The court noted that, for the purposes of the motion, Snowflake did not dispute that Herskovitz established a prima facie case of age discrimination and turned to whether he raised a triable issue of material fact. It stated that "if [Herskovitz] attacks the veracity of [Snowflake's] stated nondiscriminatory reasons for adverse employment actions, he must include evidence creating a triable issue of fact as to discriminatory intent."

The court found Herskovitz did not raise a triable issue regarding his 2019 demotion and replacement with Besant because he did not controvert

---

[3] The trial court also granted Snowflake summary judgment on its cross-complaint against Herskovitz regarding his use of Snowflake's proprietary information. Herskovitz does not challenge that ruling, so we do not discuss it further either.

that Chris Degnan, the Snowflake executive who reassigned Herskovitz and Besant, based his decision "on his perception, accurate or not, of the respective skills of [Herskovitz] and Besant."

The court found Herskovitz did not show a triable issue regarding his 2020 employment termination because it was undisputed that Snowflake, again via Degnan, terminated Herskovitz because he was unable to timely find a new position within the company. Also, contrary to Herskovitz's contention, there was not substantial evidence that Snowflake provided contradictory reasons for his termination.[4]

Subsequently, the trial court entered judgment in Snowflake's favor. Herskovitz filed a timely notice of appeal.

## II. DISCUSSION

Herskovitz argues the trial court erred by dismissing both his second and third causes of action—for age discrimination in violation of FEHA and age discrimination in violation of public policy respectively—for the same reasons: that the court (1) applied the wrong legal standard, and (2) exceeded its authority to determine factual merit on summary judgment. We will consider these claims together.

### A. *Legal Standards*

#### 1. Summary Judgment

"A trial court must grant a motion for summary judgment 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).)" (*In re Automobile Antitrust Cases I & II*

---

[4] The court also concluded Herskovitz's effort to show discrimination by Snowflake via evidence of statistical disparities was wanting. Herskovitz does not argue on appeal that we should consider that evidence, so we do not discuss it further.

(2016) 1 Cal.App.5th 127, 150.) "Our review of an order granting summary judgment is de novo. . . . We liberally construe the evidence in support of the party opposing summary judgment [citation], and assess whether the evidence would, if credited, permit the trier of fact to find in favor of the party opposing summary judgment . . . ." (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1109.)

## 2. Age Discrimination

Under FEHA, it is unlawful for an employer, "because of the race, . . . national origin, . . . [or] age of any person, . . . to discharge the person from employment." (Gov. Code, § 12940, subd. (a).)

For employment discrimination claims, our courts *at trial* apply a three-step burden-shifting test established in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354–355 (*Guz*).) First, the plaintiff raises a rebuttable presumption of discrimination by making a prima facie showing, i.e., that "(1) [the plaintiff] was a member of a protected class, (2) [the plaintiff] was qualified for the position [the plaintiff] sought or was performing competently in the position [the plaintiff] held, (3) [the plaintiff] suffered an adverse employment action . . . , and (4) some other circumstance suggests discriminatory motive." (*Ibid*.) The employer must then "rebut the presumption by producing admissible evidence . . . that its action was taken for a legitimate, nondiscriminatory reason." (*Id*. at pp. 355–356.) "The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive. [Citations.] In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias." (*Id*. at p. 356.)

"A defendant's summary judgment motion ' "slightly modifies the order of these [*McDonnell Douglas*] showings." ' " (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 160.)  The defendant has the initial burden "to either (1) negate an essential element of [the plaintiff's] prima face case [citation] or (2) establish a legitimate, nondiscriminatory reason for [the challenged adverse action]." (*Ibid*.)  Once done, the employee " 'must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.' " (*Ibid*.)

"[D]irect evidence of intentional discrimination is rare, and . . . such claims must usually be proved circumstantially." (*Guz*, supra, 24 Cal.4th at p. 354.)  Nonetheless, "if nondiscriminatory, [an employer's] true reasons need not necessarily have been wise or correct.  [Citations.]  While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*.  Thus, 'legitimate' reasons [citation] in this context are reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding *of discrimination*." (*Id*. at p. 358.)

A plaintiff's evidence "must be construed liberally," but "in employment cases it ' " 'remains subject to careful scrutiny.' [Citation.]  The employee's 'subjective beliefs . . . do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations.' " ' " (*Taylor v. Financial Casualty & Surety, Inc.* (2021) 67 Cal.App.5th 966, 994.)

**B.** *Analysis*

**1. Snowflake's Contentions in Support of Its Summary Judgment Motion**

In support of its summary judgment motion, Snowflake asserted nondiscriminatory reasons for the decisions of Chris Degnan, who was its Chief Revenue Officer, to (1) replace Herskovitz, then 62 years old, as the company's head of sales engineering with Eve Besant, then 37 years old, and reassign him to be in charge of sales engineering's global expansion; and (2) require Herskovitz, when this global expansion stalled, to find another internal position, and terminate his employment when he did not.

a. *Replacing Herskovitz with Besant and Reassigning Him*

Specifically, Snowflake asserted that in 2019, a new chief operating officer (CEO) took over its management and, contemplating an initial public offering for Snowflake, "instituted organizational changes and changes in Snowflake's approach to doing business." The new CEO wanted "the Sales Engineering organization to rapidly scale," and "be 'flatter' in structure with fewer managers who managed other managers."

Chris Degnan hired Herskovitz in 2014 as Snowflake's first sales engineer and directly supervised him throughout his employment at Snowflake. Degnan promoted Herskovitz in 2016 to Vice President of Sales Engineering and, in 2018, to Vice President of Global Sales Engineering.

In the spring and summer of 2018, based on Snowflake's expansion and at Degnan's suggestion, Herskovitz searched for a Vice President of Sales Engineering, North America who would report to him, and he hired Besant for this new role. Herskovitz testified in deposition that one of the reasons he hired Besant was because he felt "we would benefit from what she learned at SAP [her previous company]," which "had been successful over a long haul and I felt that there were processes we could learn from

that . . . were a little different than the usual Silicon Valley processes." According to Herskovitz, Besant had some experience scaling operations at SAP, including growing a group of 65 people to 92 people. Herskovitz "hoped to learn from her as well as have her take over some responsibilities," as it had been his practice to hire "people who knew things I didn't know."

Prior to his reassignment, Herskovitz told Degnan he ranked Besant first among his direct reports, that she "had the biggest role" and "the biggest potential," that she had the "most prior experience as a 2nd line manager in a large company," and that she was a " 'trusted partner in scaling the largest chunk of the [sales engineering] team.' "

Degnan was impressed with Besant. He "personally observed Ms. Besant's ability to take a leadership role in effectuating new operational processes, manage complex organizational structures, and communicate engineering advancements." She impressed him and "other key stakeholders" in April 2019 with her presentation of a quarterly report regarding the Sales Engineering organization.

Degnan also believed that Herskovitz, "[a]lthough . . . skilled in creating start-up organizations and building businesses from nothing," "did not [have] the experience or ability to effectively scale the Sales Engineering organization." On the other hand, Degnan believed "Herskovitz had significant skills in developing international offices, as he had done successfully in Europe and Asia-Pacific regions, and was then doing in Singapore."

According to Degnan, in 2019, he thought Snowflake's role as "a major player in the cloud-based storage and analytics space," its contemplation of an initial public offering, and the new management priorities meant

"Snowflake needed to be able to scale its business at a rapid pace (i.e., growing the business from its current size to something bigger, more efficient, and more effective)." Degnan concluded "the Sales Engineering organization needed to rapidly scale to meet leadership expectations," and that "the leader of the Sales Engineering team needed to have the skills and experience to scale the organization, especially with the possibility of an IPO on the horizon." He decided to make a change in the Sales Engineering leadership.

Specifically, Degnan decided in the spring of 2019 that Besant would replace Herskovitz "and her job would be to focus on scaling the organization." Herskovitz would "dedicate his full working time to launching Snowflake into new global markets, starting with Japan," where he would work for six months, and then "likely into other geographic markets, such as Latin America." Degnan's decision to promote Besant and reassign Herskovitz had nothing to do with either's age. Herskovitz characterized these circumstances in an April 2020 internal email this way: "Snowflake has changed (new CEO, CFO, focus on scaling and improving margins for IPO)." "I no longer run Snowflake's global SE team. Based on my experience in opening new territories . . . , the CRO [Degnan] wanted me to focus on additional new territories like Japan, LatAm, etc."

Degnan also stated that in either late 2018 or early 2019, before he reassigned Herskovitz and Besant in May 2019, he told another Snowflake manager who reported to him, and who also had a skill set well-suited to building and not scaling, that Herskovitz's " 'skill set . . . was in helping build and not scale.' " That manager testified in deposition that Degnan criticized his scaling abilities, wanted him to bring in someone with "big company experience" who "dealt with scaling," and that someone with

11

scaling skills was brought into his department. Further, Degnan told him "one time that [Herskovitz] had trouble scaling[,]" testifying it was a general comment about scaling challenges and not about Hersovitz's performance, along the lines of: "[A]s we think about the next chapter of getting the company to bigger, both you and [Herskovitz] don't have that big company type of experience." The manager also testified that as a company grows from a thousand or so employees to 30 thousand, "there's just a different scale associated with management" regarding how to lead, motivate, set boundaries, and "creat[e] more layers of management. . . . [T]here's more complexity . . . ."

Snowflake also pointed out that Herskovitz, in a May 7, 2020 text message found in Herskovitz's tardily produced documents, wrote to a friend within the company, "I have the energy and desire to do another startup, don't want to work for a big company. I'm more convinced than ever that I'm a Builder not a Scaler."[5]

In short, Snowflake contended that it reassigned Besant and Herskovitz because of "1) Snowflake's changing business direction, 2) Degnan's belief that Snowflake needed to be able to scale its business at a rapid pace, 3) Besant's experience and expertise in scaling a sales engineering organization, 4) Herskovitz's lack of experience and expertise in scaling a sales engineering organization, and 5) Herskovitz's skills and expertise in opening international sales and sales engineering offices."

---

[5] Herskovitz incorrectly contends he sent this message "in the summer of 2020, long *after*" his termination. But the timestamp on the message indicates Herskovitz sent it on May 7, 2020, and that, in it, he says "time is running out at Snowflake," and that the day before he was told there was no role for him on a Snowflake team. Thus, the record shows he sent the text message prior to his May 15, 2020 termination.

b. *Herskovitz's Employment Termination*

Snowflake further contended that when the COVID-19 global pandemic broke out in early 2020, it became clear to Degnan that Snowflake would not be expanding into any other countries around the world for the foreseeable future, including Japan. According to Degnan, it quickly became clear that "Herskovitz would need to find a new role if he wanted to continue at Snowflake." Herskovitz himself wrote in an April 2020 email that the pandemic was "killing nearly all travel for months," and that Snowflake's expansion into new geographic areas was "on ice for a while." He testified in deposition, "I knew I needed to find a new role because I knew I had been switched from career mode into project mode. And if there weren't new regions to expand into, . . . I'd have to figure it out."

To help Herskovitz, Degnan "personally contacted a number of individuals at Snowflake and asked them to meet with Mr. Herskovitz about potential roles." At some point, it was determined that Herskovitz would have 45 days to find a new position.

Herskovitz does not dispute that he explored potential opportunities while continuing to receive full pay and benefits; that he spoke with 25 Snowflake employees about what might be available to him; and that at no point during his internal job search was anyone at Snowflake ever instructed not to hire him.

Herskovitz was considered for positions in both the Field Chief Technology Officer (CTO) and Sales Engineering organizations but did not receive job offers from them. Snowflake contended this was for nondiscriminatory reasons.

It contended Field CTO's reasons included that, according to its head, in the course of conversations between members of his team and Herskovitz, and based on the head's own work with Herskovitz for a year or two, it

13

became apparent that Herskovitz was not strong in the ability to innovate and create new products, an important part of the role for which he was being considered (although he was strong in another part, customer interaction). In addition, in conversations with the team, Herskovitz critiqued the CTO organization and asserted what he thought it should be doing, creating the sense that he was "condescending" and perhaps lacking in the empathy and emotional intelligence needed to help build a team. Despite the head's efforts to "carve out" an opportunity for Herskovitz at Degnan's encouragement, he could not because of the negative assessments of his team.

As for the Sales Engineering organization's reasons for not hiring Herskovitz, Besant testified in deposition that Herskovitz talked with a member of her team about playing a role in the organization. She did not attempt to sway that person's view of Herskovitz, and the person came away from his conversation with Herskovitz thinking they were not aligned on the kind of role Herskovitz should play. Herskovitz told her he did not think that person was "head[ing] down the right path."

Besant had other concerns. Because Herskovitz had bluntly said previously that he was not interested in working in her organization, her interest in bringing him in was "extremely low." In any event, "of two-thirds significance" was Herskovitz's desire to be paid more than double what Besant had in mind for the role. She was also aware of his "rumblings" about his disappointment with certain Snowflake leaders, did not know "how long his negative attitude had been an issue," and "didn't have confidence that he would come to be [a] positive force on our team."

When Herskovitz did not find a new position in Snowflake within 45 days, Degnan decided he needed to terminate his employment, and it was

14

terminated on May 15, 2020. Degnan's decision to terminate Herskovitz's employment, he asserted, had nothing to do with Herskovitz's age.

By this evidence, Snowflake met its burden as movant of showing its adverse employment actions against Herskovitz, whether wise or unwise, were for nondiscriminatory reasons. By doing so, it successfully shifted the burden to Herskovitz to present evidence that raises a rational inference that Snowflake acted because of age discrimination. Herskovitz does not argue otherwise. We turn, then, to his showing, but first address his claim that the trial court committed legal error.

## 2. Herskovitz's Contentions in Opposition to Snowflake's Summary Judgment Motion

*a. The Correct Legal Standard for Evaluating Herskovitz's Evidence*

Herskovitz contends the trial court applied the wrong legal standard in considering his evidence by requiring that he show *direct* evidence of age discrimination when he needed only to raise a permissible inference.

Herskovitz makes three contentions in support of this argument. First, he relies for the correct statement of law on a Sixth Appellate District opinion which, consistent with *Guz*, states that, "[i]f the employer meets its initial burden, the burden shifts to the employee to 'demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory *animus*, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action.' " (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 861 (*Serri*); see *Guz, supra*, 24 Cal.4th at p. 333 [noting that, after the defendant met its initial burden, "the burden shifted to Guz to produce evidence that the proffered reason was discriminatory or pretextual"].)

15

As we have already indicated in our own discussion of the legal standard we are to apply, *Serri*'s statement of the applicable law is correct, so we have no quarrel with Herskovitz on this point. We do, however, find both of his remaining two contentions to be problematic.

First, Herskovitz extrapolates from *Serri*'s correct statement of law that the trial court should have denied Snowflake summary judgment because he purportedly showed Snowflake stated false reasons for its adverse employment actions, and did not need to show "independent evidence demonstrating a discriminatory motive." This contention is flawed. Herskovitz's extrapolation gives short shrift to the core of the standard he quotes from *Serri* and that is emphasized by our Supreme Court in *Guz*. That is, regardless of whether a plaintiff relies on prima facie discrimination or pretext, the plaintiff can only defeat summary judgment if able to demonstrate " 'a triable issue by producing substantial evidence . . . *such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action.*' " (*Serri, supra*, 226 Cal.App.4th at p. 861, italics added.)

In other words, as the *Guz* court instructed, "[*i*]*n an appropriate case*, evidence of dishonest reasons, considered together with elements of the prima facie case, *may permit* a finding of prohibited bias." (*Guz, supra*, 24 Cal.4th at p. 356, italics added.) But this does not mean that *Guz, Serri*, or any other case *requires* a trial court to deny summary judgment whenever a plaintiff establishes dishonest reasons for an adverse employment action or prima facie age discrimination—assuming solely for the sake of argument that Herskovitz did so below. Indeed, the cases do not. (See, e.g., *Slatkin v. University of Redlands* (2001) 88 Cal.App.4th 1147, 1158–1159 [stating, after quoting *Guz*, "We question, however,

16

whether this is 'an appropriate case,' " and concluding "there was insufficient evidence of a discriminatory motive."].)

As the *Guz* court made clear, "the ultimate issue is simply whether the employer acted with a motive to discriminate illegally." (*Guz*, *supra*, 24 Cal.4th at p. 358, italics omitted.) Accordingly, the *Guz* court further instructed that "an inference of intentional discrimination cannot be drawn solely from evidence, if any, that the company lied about its reasons. The pertinent statutes do not prohibit lying, they prohibit discrimination. [Citation.] Proof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons. [Citation.] Still, there must be evidence supporting a rational inference that intentional discrimination, on grounds prohibited by the statute, was the true cause of the employer's actions." (*Id.* at pp. 360–361, italics omitted.)

In short, the *Guz* court explained, an "age discrimination claim under the FEHA cannot survive [a] motion for summary judgment unless the evidence in the summary judgment record places [the employer's] creditable and sufficient showing of innocent motive in material dispute by raising a triable issue, i.e., a permissible inference, that, in fact, [the employer] acted for discriminatory purposes." (*Guz*, *supra*, 24 Cal.4th at p. 362.)

And that *was* the standard applied by the trial court. Herskovitz contends that the trial court erred by "impermissibly demand[ing he] provide additional, direct evidence of discrimination." The record shows otherwise. As we have discussed, the trial court, in its written order granting summary judgment, cited *Hicks v. KNTV Television, Inc. supra*, 160 Cal.App.4th 994 at page 1003. That passage states the standard correctly, indicating that a plaintiff, once the employer has met its initial

17

burden, must produce " 'substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, *or* evidence that the employer acted with a discriminatory animus, or a combination of the two, *such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.*' " (*Hicks v. KNTV Television, Inc.,* at p. 1003, italics added.)

Moreover, the trial court indicated that Herskovitz could meet this burden by producing circumstantial evidence from which such a reasonable inference could be drawn. The court specifically stated, "Here, plaintiff shows that he is in a protected classification and that he was replaced by a younger person. That fact alone is insufficient to defeat this summary judgment motion. There is no other evidence that can support, *either directly or inferentially*, that there was discrimination." (Italics added.) This makes plain the court understood that Herskovitz could defeat Snowflake's summary judgment motion by presenting evidence merely raising an inference of discrimination.

The trial court concluded Herskovitz did not meet this standard. As we will now discuss, we agree.

b. *Herskovitz's Contentions*

Herskovitz next contends that the trial court exceeded its authority to determine factual merit on summary judgment rather than just determine whether he presented substantial evidence that raised a triable issue of material fact.

As did the trial court, we will assume for argument's sake that Herskovitz showed prima facie age discrimination. But we conclude he did not raise a triable issue of material fact as to whether Snowflake's stated reasons for its actions against him were pretextual. And regardless of what he may have established, the determinative point under the legal standard

18

articulated in *Guz*, *Serri*, and the other cases we have cited is this: None of Herskovitz's evidence raises a permissible inference that Snowflake's actions were motivated by *age discrimination*.

We have already discussed Snowflake's explanations. Upon a new management's focus on scaling, Degnan decided to reassign Herskovitz and Besant to take best advantage of their particular skill sets. Snowflake presented undisputed evidence to support that decision. Besant had a particular expertise in scaling and experience with a larger company engaging in that task, while Herskovitz was stellar at growing sales engineering organizations. Snowflake did not assert that Degnan believed Herskovitz was incompetent at scaling; rather, Degnan's explanations indicate he was making best use of the resources available to him to meet the new management's change of focus. Notably, he did not fire Herskovitz, but reassigned him to a substantial new role for which he was well-experienced; nothing about this reassignment implies age discrimination.

Herskovitz argues Snowflake did not make these reassignments for the reasons Degnan stated because, he contends, he was more qualified than Besant to lead the Sales Engineering organization. He cites his years of experience with Snowflake, that he grew Snowflake's Sales Engineering organization from one person—him—to 172 sales engineers at the time of his reassignment, doubling and sometimes tripling the number each year; that he was repeatedly recognized for "his prowess in the position"; and that Besant was 25 years his junior, less experienced than him, and had managed no team larger than 92 people. But whether or not he was objectively more qualified—and Snowflake has grounds to contend that Besant was objectively a better choice to scale the Sales Engineering organization given her experience scaling with a larger company—is not

19

what matters here. The question is whether Snowflake, via Degnan, was motivated by age discrimination. To this, Herskovitz offers nothing of substance, relying only on his prima facie showing and his *own* view that he was a better choice than Besant for the repurposed position as leader of the Sales Engineering organization. But his own opinion is not particularly relevant.[6] (*Taylor v. Financial Casualty & Surety, Inc.*, *supra*, 67 Cal.App.5th at p. 994 [The employee's " 'subjective beliefs . . . do not create a genuine issue of fact' "].) What matters is Snowflake's intent, especially Degnan's, given the evidence here, and on this issue Herskovitz presents nothing that contradicts Degnan's assertions of why he did what he did. Under the circumstances we have just discussed, we therefore conclude Herskovitz's evidence of his demotion and replacement is insufficient to raise a permissible inference of age discrimination.

The same is true for Herskovitz's challenge to Snowflake's contentions about its end of his new role as head of the global expansion of sales engineering. According to Snowflake, Herskovitz's expansion efforts in Japan, and the chances for expansion elsewhere, were upended by the outbreak of the COVID-19 global pandemic in early 2020. Herskovitz virtually ignores this reason. Instead, he contends Snowflake undermined his global expansion efforts by slashing his budget and limiting his opportunities in Japan, which, he contends, was a deliberate effort to undermine him, shows pretext, and raises a rational inference of age discrimination. This is too big a leap to raise a triable issue of material fact.

---

[6] Even if it were, Herskovitz's own statement to another Snowflake employee shortly before his employment termination that he was a "builder," not a "scaler," while it does not necessarily mean he was unqualified to lead the Sales Engineering organization, suggests his own preferences were consistent with Degnan's decision to reassign him.

Even if Snowflake reduced Herskovitz's budget and limited his opportunities, it could have done so for a myriad of reasons; Herskovitz offers only speculation that it was a set-up for later termination based on age discrimination. Again, something more is needed for his evidence to reasonably imply that Snowflake reduced his budget and limited his opportunities as part of a deliberate effort to discriminate against him because of his age. Herskovitz again offers nothing beyond his own opinion and conjecture on this point.

As for the events that occurred after Herskovitz returned from Japan, Snowflake's requiring him to find another position himself or face termination, as opposed to keeping him in his role until the COVID-19 pandemic abated or assigning him directly to a new role, raises a question as to whether Snowflake was fully committed to keeping Herskovitz employed, despite his considerable experience and success there. A trier of fact could reasonably conclude that Snowflake's failure to ensure Herskovitz was retained in some position within the company suggests a flagging commitment to him.

But nothing about this flagging commitment, if it existed, implies anyone at Snowflake was motivated by age discrimination. It is undisputed that Snowflake allowed Herskovitz 45 days to interview for positions within the company rather than terminate his employment. Further, Snowflake presented evidence, also unchallenged by Herskovitz, that Degnan, Herskovitz's long-time supervisor and supporter, encouraged other managers to consider Herskovitz for positions within their organizations. (See *Slatkin v. Univ. of Redlands supra*, 88 Cal.App.4th at p. 1158 [" ' "Where the same actor is responsible for both the hiring and the firing of a discriminatory plaintiff, . . . a strong inference arises that there was no

21

discriminatory motive." ' "].)  Also, two managers submitted declarations in support of Snowflake's summary judgment motion indicating they considered and rejected Herskovitz for nondiscriminatory reasons.

Herskovitz makes only vague allegations amounting to the contention that some sort of conspiracy existed among Snowflake managers to merely go through the motions when the intention all along was to fire him motivated by age discrimination.  He alludes briefly to an email sent from the Chief Financial Officer (CFO) to Degnan in April 2020 asserting that, since Herskovitz was not going back to Japan, if he did not have a meaningful role and responsibilities, he needed to be terminated, an email to which Degnan agreed.

Nothing in this exchange suggests the time Herskovitz was given to find such a role was a pretext, nor does Herskovitz challenge Snowflake's assertion below that Degnan did not report to or work for the CFO.  Also, Herskovitz did not dispute below that no one who considered him for a new role after his return from Japan was instructed not to hire him.  In short, there is simply no evidence of a conspiracy to go through the motions of considering him for new positions with the intent to terminate him all along—let alone to do so motivated by age discrimination.  Herskovitz again does not raise a triable issue of material fact.  (See *Slatkin v. University of Redlands*, *supra,* 88 Cal.App.4th at pp. 1157–1159 [affirming summary judgment for lack of discriminatory motive even if pretext were shown, given that "all the evidence that the University's claimed reasons were dishonest pointed equally to the conclusion that its true reasons were nondiscriminatory"].)

Herskovitz also contends Snowflake asserted inconsistent reasons for his termination, indicating pretext.  As we have already indicated, "[i]n

demonstrating that an employer's proffered nondiscriminatory reason is false or pretextual, ' "[an employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. . . . Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' . . . and hence infer 'that the employer did not act for the [asserted] non-discriminatory reasons.' " ' " (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 314.)

Herskovitz contends that Snowflake provided three different and inconsistent explanations for its termination of his employment, from which a fact finder could permissibly infer the company terminated him motivated by age discrimination. First, he contends that Snowflake, in a May 12, 2020 document, which Herskovitz describes as a "Termination Notification," described his termination as "involuntary" for "performance." Three days later, he further contends, Snowflake described his termination as "voluntary" in an "option report" given to him. Third, Snowflake asserted that he was terminated because there was not a position for him within the company.

The trial court concluded these different characterizations of his termination did not infer a discriminatory motive, and so do we. Herskovitz does not present any evidence that indicates other than in the weeks before his termination Snowflake required him to look for and find another position in the company and that he was unable to do so, although he was considered by at least two different internal organizations. Nor does he

contend that the executive who terminated his employment, Degnan, or any other management person asserted another reason for his termination.

Instead, Herskovitz relies on two apparent administrative documents that he only vaguely describes. The May 12 document is an email from Snowflake's Director of Human Resources to an undefined "Team" which states Herskovitz's upcoming termination was "involuntary" and because of "performance" without further explanation. Herskovitz does not cite any evidence that the email was given to him, that it was relied on by Snowflake to explain his termination to him, or that its author had anything to do with his termination.

Herskovitz's evidence of the May 15 "option report" is his own May 27, 2020 email to this same Director of Human Resources in which he stated that a "termination option report"—an apparent reference to his stock options—stated the reason for his termination was " 'Voluntary,' " "which," he wrote, "is false (at this time)." Herskovitz did not put forward any evidence indicating who prepared this "termination option report," that Snowflake relied on it in any way, or that its author had anything to do with Herskovitz's termination either.

Like the trial court, we conclude the administrative nature of these documents and the paucity of Herskovitz's evidence about them fail to raise a material issue of fact about Snowflake's assertion that it terminated him because he was unable to find a position within the company, and they do not raise an inference of age discrimination. (See *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1530–1531, 1533 [affirming summary judgment although there was evidence the employer gave three inconsistent reasons for termination because, regardless, a discriminatory motive could not be inferred from them]; *Arnold v. Dignity Health* (2020)

24

53 Cal.App.5th 412, 427–430 [affirming summary adjudication despite evidence of comments about the plaintiff's age by employees who were not involved in his termination and which did not demonstrate discriminatory animus, and evidence of the company's failure to follow its disciplinary process, the court finding the absence of "any evidence supporting a rational inference that discrimination . . . was the true reason for [the employer's] actions"].)

In short, Herskovitz does not present substantial evidence that raises a triable issue of material fact regarding whether, in terminating his employment, Snowflake was motivated by age discrimination. The trial court therefore correctly granted Snowflake summary judgment. In light of this conclusion, we have no need to address Herskovitz's contention that the trial court also erred in dismissing his claim for punitive damages.

## III. DISPOSITION

The judgment is affirmed. Snowflake is awarded costs of appeal.

STREETER, J.

WE CONCUR:

BROWN, P. J.
CLAY, J.*

---

* Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.